AMERICAN INSTITUTE FOR ECO-
NOMIC RESEARCH

v.

The UNITED STATES.

No. 7-60.

United States Court of Claims.
May 9, 1962.

Guy Emery, Washington, D. C., for plaintiff. Emery & Wood, Washington, D. C., were on the brief.

John F. Palmer, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen. for defendant. Edward S. Smith and Philip R. Miller, Washington, D. C., were on the brief.

JONES, Chief Judge.

Plaintiff American Institute for Economic Research, organized under Massachusetts law as a charitable corporation, sues to recover income taxes paid for the calendar years 1957 and 1958 in the amounts of $231 and $510, respectively, with interest as provided by law.

Prior to 1957, plaintiff had invested in the common stock of Tri-Continental Corporation, an investment trust. During 1957 and 1958, Tri-Continental paid, on plaintiff's account, income taxes on undistributed capital gains allocated to plaintiff's stock holdings in the amounts of $231 for 1957, and $510 for 1958. Properly exhausting its administrative remedies, plaintiff here asserts exemption from these assessments under section 501(c) (3) of the Internal Revenue Code of 1954. 26 U.S.C. (I.R.C.1954) § 501(c) (3) (1958 Ed.).

Generally, section 501(c) (3) allows exemption to corporations "organized and operated exclusively" for charitable, scientific, or educational purposes where no part of the earnings inures to the benefit of any private shareholder or individual.

Plaintiff was organized in 1935 as a trust, and Edward C. Harwood, who was instrumental in the trust's creation, was appointed trustee. Plaintiff's stated aim was:

"teaching and disseminating economic knowledge with a view to advancing the welfare of the American people, and the doing of everything necessary, suitable and proper for the accomplishment of said purposes." [Finding 2.]

The Commissioner of Internal Revenue ruled in 1938 that the trust was an ex-

empt organization under section 101(6) of the Revenue Act of 1938, 52 Stat. 447, 481, which is in terms similar to section 501(c) (3) of the 1954 Code.

In 1939, pursuant to applicable Massachusetts law, plaintiff reorganized as a charitable corporation. Mr. Harwood was named its director and cotrustee. In the latter capacity he was to be entitled to life tenure with plaintiff. During the years involved in this suit, Mr. Harwood's compensation totaled about $18,000 annually.

Plaintiff's charter indicated its organizational purposes were:

"To conduct scientific research in the general economic field and to disseminate the results of such research in order to educate individual students and the general public, so that there may be more widespread understanding of the fundamental economic relationships affecting the citizens of the United States, both as individuals and as members of a complex economic society, with the ultimate object of advancing the welfare of the American people." [Finding 4.]

The pertinent bylaws are set out in finding 4. Of present interest is Part I, numbers 11 and 20, which provide as follows:

"11. From time to time the Institute shall publish the results of the scientific research in progress. Such publications may be in form of books, booklets, pamphlets, periodic reports, bulletins, and like material; provided that the Institute may not engage in a general publishing business, and the only publications issued shall be those presenting the results of research undertaken by members of the Institute Staff or Associate Members; provided further, that no manuscripts from outside sources shall be solicited.

\* \* \* \* \* \*

"20. The results of the Institute's scientific research, as embodied in the Research Reports published by the Institute, shall be available to the general public and no subscribers and other supporters of the Institute shall be required to keep such material confidential. All such material shall be freely available to students and research organizations in the field, and may be quoted in full or in part with or without credit by such individuals and organizations."

Plaintiff was required to file a claim for exemption under section 501(c) (3) in 1955. This claim and subsequent revisions were denied by the Service.

Having outlined plaintiff's organizational aspects, which are more completely delineated in our findings of fact to which reference is made, we now turn to the facts necessary for an understanding of plaintiff's actual operations.

During the period involved in this suit, and almost from its inception, plaintiff has published two periodicals, the Investment Bulletin and the Research Reports. According to plaintiff,

"\* \* \* The bulletins are issued twice monthly and include brief analyses of industries and individual securities on our approved lists. In addition, the general economic situation and special factors that have an influence on security values are discussed clearly and concisely. Please note that the Institute does not give advice on margin trading and does not attempt to forecast the short swings or so-called technical movements of the stock market. Our bulletins are intended to aid those who wish to follow a sane and sensible program." [Finding 10.]

In at least one instance, the Investment Bulletin has contained plaintiff's suggestion as to the proper vote by subscribers holding stock in particular companies which had announced plans to merge. Subscribers to this bulletin are entitled to receive a Quarterly List of Recommended Securities. This publication contains recommendations regarding efficacious purchase or sale of selected fixed income securities, investment

trust shares, and common stocks. Such recommendations vary as plaintiff deems advisable to achieve the objectives of any of three types of investment programs, viz., "Investment Plan," "Speculative-Investment Plan," and "Speculative Plan."

Charging one-quarter of one percent of the annual capital involved, plaintiff provides, for about 300 clients, a "Continuous Supervising Service" whereby the client is given specific recommendations for sales and purchases of securities in his portfolio. Further, plaintiff will prepare, for a $1 fee, an analysis of any specified security with a conclusion as to its investment merit.

On the basis of information furnished by any individual, plaintiff offers, without cost, to ascertain

"Whether or not the probable savings or other reasons would justify a complete report on your insurance or retirement program, and the cost of such a report.

"Your need for special assistance in planning your estate so that income taxes and the estate and inheritance taxes payable at your death will be a minimum.

"Whether an appraisal of your investment portfolio with recommendations as to which securities should be sold, retained, or added, would be advisable, and the fees involved.

"Whether the Institute's other services such as the continuous supervision of investments would be helpful to you, and the cost of such services." [Finding 10.]

Plaintiff describes the weekly Research Reports as follows:

" * * * Current economic events are analyzed, and important economic factors such as trade and industrial activity, prices, and money-credit trends, which have a bearing on the future, are portrayed in an unusual series of charts. Included are the statistical indicators of business-cycle changes first developed by the National Bureau of Economic Research. Moreover, the HARWOOD INDEX OF INFLATION, published monthly in the Research Reports in graphic and tabular form, indicates clearly the present stage of the inflation menace and follows its progress. Probably no single indicator will be of greater importance during the years ahead than this index." [Finding 10.]

Supplemental thereto, plaintiff publishes at various times more detailed studies of specific economic problems.

The faculty and staff of plaintiff conduct the research necessary for the preparation of all publications. In addition to those discussed above, such research also provides source material for many books published in pamphlet form which deal with economic and financial problems.

Plaintiff is able to accomplish about one-half its printing requirements on its own premises; an independent printing establishment prints the remainder.

A fellowship program, consisting of a two-year course of training in research and advanced economics at the postgraduate level, was initiated by plaintiff in 1946. From three to eight Fellows participated at various times between the program's inception and its discontinuance, because of the Korean War, in 1955.

Plaintiff was also instrumental in the formation in 1955 of The Interfoundation Committee for Economic Scholarships. This program, in which plaintiff was joined by three private foundations, was an attempt to interest qualified high school students in the field of economic research. It was believed this program would help to supply the future talent for plaintiff's then inactive fellowship program. Agreeing to bear the program's administrative expense and to provide any scholarships which the foundations were unable to provide at a given time, plaintiff received $43,535.46 from the three foundations during 1957 and 1958. Sometime during the years 1955 through 1960, plaintiff itself contributed from

$12,000 to $14,000 to the scholarship program. For 1957 and 1958, scholarships were made available in the total amount of $32,625, averaging about $80 per student.

The subscription cost for the semimonthly Investment Bulletin is $10 per year; the weekly Research Reports costs $25 per year. Some subscribers, nominated "Annual Sustaining Members," pay $35 annually, for which they receive the Investment Bulletin, Research Reports, and all book publications (including annual revisions) currently available. In the years 1957 and 1958, plaintiff received $96,540.17 and $117,300.78, respectively, from these individuals. From those who subscribe to the Investment Bulletin alone or one of the investment services, plaintiff received $132,226.59 and $157,544.31. The Research Reports and many of the books dealing with various economic problems are distributed free to approximately 2,000 libraries, the Investment Bulletin is not so distributed.

Plaintiff's burden is to show that the facts discussed above place it within the language of section 501(c)(3) which requires exclusive devotion to an exempted purpose. "This plainly means that the presence of a single [nonexempt] * * * purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempted] * * * purposes." Better Business Bureau v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945).[1]

A major argument of defendant proceeds, paraphrased, as follows: Many of plaintiff's publications, specifically the semi-monthly Investment Bulletin and the Quarterly List of Recommended Securities, merely provide advice for a fee to individual subscribers toward achieving a sound investment program. Plain-

tiff's "Continuous Supervising Service" (which gives recommendations for sales and purchases of securities in the individual's portfolio) and its analysis for a fee of specific securities are of a similar nature. The totality of these activities is indicative of a business, and plaintiff's purpose is thus a commercial purpose and nonexempt.

■ Since the presence of a single substantial nonexempt purpose will defeat its claim, plaintiff must necessarily answer defendant's preliminary argument even though this argument is directed toward these selected activities, rather than plaintiff's operations as a whole. This is so because, as shown by plaintiff's current receipts found in finding 13, these particular activities clearly demonstrate a substantial purpose of plaintiff. As its answer, plaintiff contends that dissemination of information of this nature, gained by scholarly research which would go for naught without dissemination, is primarily educational.

■ "Education" is an extremely broad concept, and Congress has not specifically defined its meaning in a tax sense. We note that the judiciary will liberally construe, and rightfully so, provisions giving exemptions for charitable, religious, and educational purposes. See e. g., Harrison v. Barker Annuity Funds, 90 F.2d 286 (7th Cir. 1937).

Of constructional pertinence is our decision in Scripture Press Foundation v. United States, Ct.Cl., 285 F.2d 800, cert. den., 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed. 2d 523. There the problem was "whether a religious publishing house, lacking denominational ties, merits tax exempt status." In denying exemption, we found the dispositive test to be "whether the business activities of the taxpayer are incidental to its charitable [or edu-

---

1. This case involved section 811(b)(8) of the Social Security Act, 49 Stat. 620, 639, 42 U.S.C.A. § 1011(b)(8), 26 U.S.C.A. (I.R.C.1954) §§ 3121, 7701(a)(1), which is in terms substantially the same as section 501(c)(3) of the Internal Rev-

enue Code. See Scripture Press Foundation v. United States, Ct.Cl., 285 F.2d 800, cert. den. 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523, in which we cited the case as relevant authority for the construction of section 501(c)(3).

cational] objectives, or whether, in fact, the converse is true."

Our approach, then, is to first assume *arguendo* an educational purpose without giving definitive meaning to that concept, and next ascertain whether or not the taxpayer has an additional commercial purpose. Should the answer to the latter inquiry be affirmative, we must decide whether the commercial purpose is primary or incidental to the exempt purpose. That on the facts before us the answer to the first question is affirmative requires no extensive discussion. The difficult question is whether the commercial purpose is primary.

■ Plaintiff admits the amounts received for the publications giving investment advice are above their actual cost of production. (And see finding 13, which shows an operating profit in this sense of approximately 9.2 percent and 4.5 percent in 1957 and 1958, respectively.) In Scripture Press, we indicated that profits are, although not conclusive, at least some evidence that the business purpose is primary.

It is obvious that the service offered by plaintiff is one commonly associated with a commercial enterprise. Plaintiff contends, however, that there is a difference; i. e., that it is not concerned with making a profit in a business sense. Plaintiff argues that the subscriptions of "Annual Sustaining Members" are charitable gifts, and that this method of obtaining funds was chosen so as to preclude any obligation to large contributors. But it is impossible to ignore the fact that these "Members" and those individuals who solely subscribe to the Investment Bulletin are paying for and receiving a desired service, investment advice, and that they subscribe, for the most part, to the publications for that purpose. Since the subscribers receive full value in exchange for their money, it is difficult, if not impossible, to regard these payments as charitable contributions.

In order for plaintiff to obtain its "contributions," it must proffer something valuable in return. This neces-

sity or purpose to provide such information and service as would be desired by the public places plaintiff in competition with other commercial organizations providing similar services. Plaintiff has chosen to compete in this manner and, as a consequence, plaintiff's activities acquire a commercial hue.

It is thus readily apparent that those operations emphasized by defendant are more analogous to commerce than to education. And, of course, the operational test of section 501(c) (3) is as decisive as the organizational test. Exclusivity is required by both. By the sale of these publications and services, plaintiff has entered, unwittingly or not, a business. We conclude that this business purpose is primary and not incidental to any educational purpose which may be present. It is not the fact of profits alone which compels this conclusion, for plaintiff is also hampered, as we have discussed above, by the methods it has selected to disseminate this type of subject matter.

All we have said regarding the comparative stress of business as opposed to educational purpose applies as well to any contention that plaintiff is a charitable or scientific corporation. If there be a substantial nonexempt purpose, the corporation is nonexempt. Plaintiff's investment service in all its ramifications may be educational, but its purpose is primarily a business one.

As to plaintiff's argument that, since any profits gained from the sale of its publications are used for nonexempt purposes, it is therefore entitled to exemption, we need only refer to the adoption by the majority of this court of our Commissioner's opinion in The SICO Foundation v. United States, Ct.Cl., 295 F.2d 924.

Plaintiff's petition will be dismissed.

It is so ordered.

DURFEE, LARAMORE and WHITAKER, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and argu-

ment of counsel, makes findings of fact as follows:

1. The plaintiff by this action seeks the refund of income taxes (plus statutory interest) alleged to have been paid erroneously to the defendant for the taxable years 1957 and 1958 in the amounts of $231 and $510, respectively. The issue involved is whether, for the taxable years involved, plaintiff was an organization exempt from the payment of income taxes under section 501(c) (3) of the Internal Revenue Code of 1954, 26 U.S.C. (I.R.C.1954) § 501(c) (3) (1958 Ed.) That section, in pertinent part, provides an exemption from income taxes for any corporation, fund, or foundation which is "organized and operated exclusively" for charitable, scientific, or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

2. The plaintiff organization was conceived in 1934 by Edward C. Harwood and Helen Fowle. They first formalized the organization as an unincorporated trust by an Agreement and Declaration of Trust dated January 10, 1935, by which they transferred to Edward C. Harwood, as Trustee, "all the books, papers, records, office equipment, good will, and property of whatever nature and wherever situated which is at present used in the conduct of the work of the American Institute for Economic Research, for the purpose of teaching and disseminating economic knowledge with a view to advancing the welfare of the American people, and the doing of everything necessary, suitable and proper for the accomplishment of said purposes."

3. On August 19, 1938, the Commissioner of Internal Revenue ruled that plaintiff, as an unincorporated trust, was an exempt organization within the purview of section 101(6) of the Revenue Act of 1938, 52 Stat. 447, 481, and relieved plaintiff of the need to file returns of income so long as its purposes and activities remained unchanged. The ruling stated in pertinent part, as follows:

"According to the evidence recently furnished this office, the above-mentioned trust was the result of consideration and discussion, by persons specializing in economics, etc., of the importance of the economic questions facing the country and the essential progress in reaching satisfactory solutions to such problems in order to secure the continuation of our form of government and our civilization.

\* \* \* \* \* \*

"It appears that the purpose of research, teaching and dissemination of economic knowledge with the object of advancing the welfare of the American people is being carried out, the actual activities consisting primarily of scientific research in the field of economics and publishing and disseminating the results of such research. \* \* \*

"In accordance with the decision \* \* \* in Bok v. McCaughn, 3 Cir., 42 F.2d 616 and the decision \* \* \* in Fifth Third Union Trust Company v. Commissioner of Internal Revenue, 6 Cir., 56 F.2d 767, the trust here under consideration comes within the exemption provisions of Section 101(6) of the Revenue Act of 1938 and the corresponding provisions of prior revenue acts. \* \* \* "

4. Plaintiff's activities were carried on in the form of an unincorporated trust until May 15, 1939, when a group of nine subscribers, including the two original organizers, entered into an agreement of association to form a corporation pursuant to Chapter 180 of the General Laws (Ter.Ed.) of Massachusetts, providing for the formation of charitable corporations. The Agreement of Association provides in pertinent part:

"We, whose names are hereto subscribed, do, by this agreement, associate ourselves with the intention of forming a corporation under the provisions of chapter 180 of the General Laws (Ter.Ed.), as amended. The name by which the corporation shall be known is

"AMERICAN INSTITUTE FOR
ECONOMIC RESEARCH

"The location of the principal office of the corporation to be in Massachusetts is the City of Cambridge

"The purposes for which the corporation is formed are as follows:—

"To conduct scientific research in the general economic field and to disseminate the results of such research in order to educate individual students and the general public, so that there may be more widespread understanding of the fundamental economic relationships affecting the citizens of the United States, both as individuals and as members of a complex economic society, with the ultimate object of advancing the welfare of the American people.

"The amount of its capital stock is none dollars.

"The par value of its shares is none dollars.

"The number of its shares is none.
*   *   *"

The foregoing was approved by the Commissioner of Corporations and Taxation for Massachusetts as the Articles of Organization of plaintiff, and on May 16, 1939, plaintiff was issued a formal Certificate of Incorporation stating plaintiff's purposes in the same language as set forth above.

The corporate bylaws (including amendments to December 31, 1959) provide, in pertinent part, as follows:

"Part I

"1. In order to avoid any possibility of bias resulting either from an attempt to satisfy wealthy donors or to protect substantial invested funds, the Institute shall derive its support from many small contributions by the general public and the sale of publications and reports presenting the result of the research undertaken. No attempt shall be made to seek an endowment fund from wealthy interests.

"2. All funds received shall be devoted to scientific research and educational purposes through the dissemination of the results of such research within a reasonable time after the receipt of such funds, and the accumulation of a reserve or other funds in excess of the aggregate expenses of the Institute for the year preceding is prohibited. Any fund which may from time to time become available in excess of that amount shall be devoted forthwith to scientific research or to the dissemination of educational information or such related activities as are consistent with the purposes of the organization.

"3. The Institute shall be absolutely nonpolitical; no funds shall be contributed to any political party, nor shall any of the Institute's personnel be permitted to carry on political activities of any kind during the regular hours of duty.

*   *   *   *   *   *

"5. There shall be no shareholders or individuals having a personal and private interest in the resources of American Institute for Economic Research, nor shall the Institute's resources be appropriated for the purpose of providing any monetary profit or other private or selfish advantage for any individuals.

"6. In order to assure the independence of the research staff, Institute activities shall be directed by the Faculty. The purpose of this provision is to insure that research activities of the Institute shall be truly scientific and that neither those activities nor the Institute's educational work shall be directed by outside trustees or other individuals having interests which might conflict with the nonpolitical, noncommerical, and scientific character of the organization.

"7. The Faculty of the Institute shall be the governing board having the powers of directors, and shall

consist of those already appointed under the provisions of the Agreement and Declaration of Trust dated January 10, 1935, and such others as shall be appointed from time to time by the Director with the consent of the Faculty. Terminations of such appointments and determination of the compensation of Faculty members shall be made by the Director, subject to the approval of his action by the Faculty; * * *
\* \* \* \* \* \*

"11. From time to time the Institute shall publish the results of the scientific research in progress. Such publications may be in form of books, booklets, pamphlets, periodic reports, bulletins, and like material; provided that the Institute may not engage in a general publishing business, and the only publications issued shall be those presenting the results of research undertaken by members of the Institute Staff or Associate Members; provided further, that no manuscripts from outside sources shall be solicited.

"12. No advertising by outside interests shall appear in Institute publications.

"13. To the extent that funds are available from contributions, the sales of publications, and other sources, work done in response to the inquiries of individuals shall, if practicable, be done without charge or at a nominal fee; and in all cases where there is a reasonable doubt as to the inquirer's ability to contribute toward the work of the Institute, no charge shall be made for answering inquiries and giving educational information.

"14. The legal title to all property and funds, of whatever nature and wherever situated, in which the Institute now has or may hereafter have any interest, legal or equitable, shall be vested in the Institute, but no sale, mortgage or alienation by the Institute of its real or personal property other than sales in the ordinary course of its business shall be made without the consent in writing of the Trustee.

"15. The Trustee shall, in behalf of the Institute, have the power to collect, sue for, receive and receipt for all sums of money at any time coming due to the said Institute; to buy and sell property, both real and personal; to employ counsel; to borrow money and issue notes to evidence such debts; to mortgage the corporate property; and to do anything else necessary for accomplishing the purposes of the Institute. He shall manage such property and exercise the above enumerated power in accordance with instructions given him from time to time by the Faculty of said Institute. When and if the Trustee believes that such instructions given to him in any respect or in the least degree violate the letter and spirit of Part I of these bylaws, he shall first petition the Court having jurisdiction for approval of his contemplated action before complying with the instructions received. If the Trustee declines to carry out instructions of the Faculty, the Faculty is hereby authorized to petition the Court having jurisdiction for an injunction directing the Trustee to act in accordance with the Faculty's instructions.
\* \* \* \* \* \*

"16. The Trustee who has served under the aforementioned Declaration of Trust shall serve as Trustee under the provisions of these bylaws until his death or voluntary resignation given in writing, and upon the occurrence of either of such events his successor shall be appointed by the Faculty of American Institute for Economic Research; provided, that the amount of the Trustee's compensation shall be determined by the Faculty of American Institute for Economic Research; provided further, that the

compensation of the present Trustee shall be limited to that received by the more able members of his West Point class who continue in the Government service.

"17. The Institute may not accept gifts of money or any other property which carry with them or involve any restrictions with respect to the research to which such funds are to be devoted or the period within which they are to be used, or which would involve activities other than those contemplated herein.

"18. None of the income or property of the Institute may be divided among or distributed to any individuals, except the reimbursement for services rendered as herein specified; nor may any funds be appropriated and expended for any other than the scientific and educational purposes of the Institute. This bylaw shall not be amended.

\* \* \* \* \* \*

"20. The results of the Institute's scientific research as embodied in the Research Reports published by the Institute, shall be available to the general public and no subscribers and other supporters of the Institute shall be required to keep such material confidential. All such material shall be freely available to students and research organizations in the field, and may be quoted in full or in part with or without credit by such individuals and organizations.

"21. The preceding portion of the bylaws (Part I) may be amended by a two-thirds vote of the Faculty of American Institute for Economic Research.

"Part II

\* \* \* \* \* \*

"5. The Trustee, in the name and behalf of the Institute, shall have the power to make all necessary contracts, orders and obligations as may be necessary in the prosecution of the business of the Institute.

"6. If the Trustee shall at any time and for any reason be held to personal liability as trustee, not due to any act of his in bad faith, he shall be held harmless and indemnified by the Institute.

\* \* \* \* \* \*

"10. Part II of these bylaws may be amended by a majority vote of the Faculty of American Institute for Economic Research. For this purpose the Trustee shall have one vote and each other member of the Faculty shall have one vote; and, if there shall be a divided vote, then the Trustee shall cast the deciding vote on the issue.

"11. In order to carry out the provisions of the original Declaration of Trust, no amendment shall be adopted which affects the tenure in office or the liability of the Trustee under this instrument. \* \* \* "

5. As required by law, plaintiff filed with the Internal Revenue Service for the years 1941–1952, inclusive, informational returns on Forms 990 or 990A. It ceased filing such returns after 1952 in the belief that it was not required to do so because it considered itself an exempt educational institution maintaining a regular faculty, curriculum, and student body.

6. On August 23, 1955, the Commissioner of Internal Revenue advised plaintiff, in substance, that the act of incorporation had created, or converted plaintiff into, a new legal entity and directed that plaintiff file a new claim for exemption from payment of income taxes.

On September 12, 1955, plaintiff filed its claim for exemption from payment of income taxes as an exempt corporation under section 501(c) (3) of the Internal Revenue Code of 1954. By letter dated March 13, 1957, the Internal Revenue Service denied plaintiff's claim to exemption, stating:

" \* \* \* It is the position of this Service that an organization which is primarily engaged in a bus-

iness of a kind ordinarily carried on for profit is not such an organization as is described in section 501(c) (3) of the Code. Since your principal source of income is from the sale of books, bulletins and services either directly or through the subscriptions of your annual sustaining members, it is our opinion that your operations cannot be considered other than as a business of a kind ordinarily carried on for profit and the fact that the product being sold is the result of your own research does not change the commercial character of your operations.

"In view of the foregoing, and without considering any other factors in your case, it is held that you are not entitled to exemption from Federal income tax as an organization described in section 501(c) (3) of the Code. Accordingly, you are required to file Federal income tax returns on Form 1120."

7. Plaintiff protested the aforesaid ruling of March 13, 1957, and filed a revised claim for exemption. The ruling, however, was affirmed on June 20, 1957. Plaintiff again protested and furnished additional information about its manner of operation. Plaintiff's protest was again denied by final ruling dated September 18, 1959, which final ruling stated, *inter alia*, as follows:

"* * * From the conduct of your activities, it appears that your primary function is to act as a source of reliable information on economic and financial subjects. For an organization to be 'educational' within the meaning of Code section 501(c) (3), its activities should be designed to cultivate, develop and influence the capabilities of the individual, or to instruct the public on subjects useful to the individual and beneficial to the community. An examination of your bulletins and services discloses that they are designed to serve as source

materials to which interested individuals may refer. The information contained therein, such as the analysis of current economic events and recommendations relative to the maintenance of a sound investment program, is disseminated for the purpose of providing a tool which may be employed by interested persons to further their private investment activities.

"In summary, what you are doing is supplying your subscribers with a substantial service offered in exchange for their furnishing a fixed consideration which may be characterized, among other things, as 'dues,' 'subscriptions' or 'contributions.' * * *

"Moreover, in connection with your methods of dissemination, an examination of the information submitted discloses that your publications are distributed in the same manner as any product on the open market, that is, through outright purchase or subscription. The total receipts attributable to the sale of your publications to the general public or your members, whether such receipts be designated as 'contributions' or otherwise, are set well above the costs connected with their manufacture. Taking into consideration all the information connected with the publication and dissemination of your printed materials— salaries constituting a large part of total expenditures; outlets such as subscription and public sale; and, the margin of profit above cost of sales—we have concluded that you are conducted in a manner similar to an ordinary commercial organization rather than an educational organization described in section 501 (c) (3) of the Code. * * * *"

8. Plaintiff's activities since its inception have remained substantially the same with the exception of its fellowship and scholarship programs described hereafter. The organizers considered

that plaintiff's activities and objectives should be threefold, namely, (1) research on problems in the general field of economics, (2) the dissemination of the results of such research, and (3) the training of students in the subject of economics. In general, plaintiff has been successful in its pursuit of objectives (1) and (2), but insofar as objective (3) is concerned, its student training program shows a history of relatively small-scale activity with intermittent interruptions.

9. Plaintiff's predecessor organization commenced its operations in a small office at the Massachusetts Institute of Technology. Shortly thereafter, it moved to larger quarters in Cambridge, Massachusetts near Harvard University and, in 1939, became incorporated. By 1946, plaintiff had expanded to a point where it was able to acquire and move into a 31-room building located on 100 acres of land near Great Barrington, Massachusetts, where its activities have been carried on ever since.

10. Almost from its inception, and continuing to date, the plaintiff has prepared and published two periodicals. One of these is called the Investment Bulletin and is published twice monthly at a subscription cost of $10 per year; the other is called Research Reports, which is published weekly at a subscription cost of $25 per year.

### The Investment Bulletin and Related Services

This publication is described by plaintiff as "intended to provide adequate advice for investors at the lowest possible cost." Four times a year subscribers to this bulletin receive a supplementary document entitled *Quarterly List of Recommended Securities* in which plaintiff makes recommendations as to purchase or sale of selected fixed income securities, investment trust shares, and common stocks. The recommendations may vary, dependent upon whether the reader is interested in (1) the "Investment Plan," which is intended to meet the needs of the investor dependent on the income from his security holdings, (2) the

"Speculative-Investment Plan," which is intended to meet the needs of the individual who has a reasonably certain and adequate business or other income and who desires to augment that income and increase his capital, or (3) the "Speculative Plan," which is intended to meet the needs of the speculator who desires to augment his capital in spite of the fact that speculation necessarily involves the risk of losses as well as the possibility of gains. Plaintiff describes its Investment Bulletin in the following language:

"* * * The bulletins are issued twice monthly and include brief analyses of industries and individual securities on our approved lists. In addition, the general economic situation and special factors that have an influence on security values are discussed clearly and concisely. Please note that the Institute does not give advice on margin trading and does not attempt to forecast the short swings or so-called technical movements of the stock market. Our bulletins are intended to aid those who wish to follow a sane and sensible program."

Plaintiff also provides a "Continuous Supervising Service" whereby individual attention is given to a client's investment portfolio with specific recommendations for security sales and purchases. The fee for this service is about one-quarter of one percent of the annual capital involved. Plaintiff furnishes this individual service to about 300 clients. For a fee of $1, plaintiff will prepare and furnish on request an analysis of any one specified security together with a conclusion as to its investment merit. Plaintiff also renders insurance advice but the fees received for this service during the years involved herein were insignificant.

Finally, plaintiff holds itself out to make, without cost, a "preliminary survey" of any individual's financial problems in order to ascertain:

"Whether or not the probable savings or other reasons would justify

a complete report on your insurance or retirement program, and the cost of such a report.

"Your need for special assistance in planning your estate so that income taxes and the estate and inheritance taxes payable at your death will be a minimum.

"Whether an appraisal of your investment portfolio with recommendations as to which securities should be sold, retained, or added, would be advisable, and the fees involved.

"Whether the Institute's other services such as the continuous supervision of investments would be helpful to you, and the cost of such services."

Confidential "personal appraisal" forms are used by plaintiff to obtain from the client in concise form such information as plaintiff deems necessary to the formulation of such preliminary survey.

### Research Reports and Related Publications

The other, and still continuing, periodical prepared and published by plaintiff from a very early date in its history is a weekly publication entitled Research Reports. The contents of this weekly publication are described by plaintiff as follows:

" * * * Current economic events are analyzed, and important economic factors such as trade and industrial activity, prices, and money-credit trends, which have a bearing on the future, are portrayed in an unusual series of charts. Included are the statistical indicators of business-cycle changes first developed by the National Bureau of Economic Research. Moreover, the HARWOOD INDEX OF INFLATION, published monthly in the Research Re-

ports in graphic and tabular form, indicates clearly the present stage of the inflation menace and follows its progress. Probably no single indicator will be of greater importance during the years ahead than this index."

Supplementing its Research Reports, plaintiff also prepares and publishes from time to time its "Special Bulletins," consisting of more detailed studies of specific economic problems.

The extensive research which goes into the preparation of the aforesaid weekly reports and special bulletins is frequently made use of by plaintiff's faculty and staff in preparing for publication in pamphlet form a large number of books devoted to economic and financial problems.[2] These books are sold at a price of $1 each. Due to the subject matter discussed, the conclusions arrived at in these books may fairly be characterized as controversial. However, there can be little doubt that they reflect extensive and scholarly research in the field of economics and finance. The director and co-founder of plaintiff has long been an exponent of applying to the study of economics, where possible, the general methods of research and inquiry developed in the domain of the natural sciences. For example, in one of his major works, he asserts:

"That the revolution in method fostered by Galileo has begun to be reflected in the field of economics has been apparent for some time. Thus far, however, progress has been slow. That the principles of modern scientific inquiry will be more widely applied in the field, that economists generally will eventually insist that the criteria for scientific work be met by those who claim to have achieved warranted assertibili-

2. One of plaintiff's books also deals extensively with elementary legal concepts involved in wills, trusts, administration of estates, contracts, negotiable instruments, marital rights, insurance, title to prop-

erty, and Federal and State taxation. The reader is cautioned, however, to seek the advice of a lawyer on "intricate financial and legal tangles." Masteller, How to Avoid Financial Tangles.

ty is what we believe must occur if progress is to be assured."[3]

This theme runs through a number of plaintiff's published books. It is fundamental to plaintiff's concept of how it should teach and develop what it calls the "economic scientist."

11. Apart from the activities described in the immediately preceding finding, plaintiff's only other significant activity has been carried on in the general field of formal education. Plaintiff has no authority to award degrees and has never conducted a college or university in the usual sense. During the years involved herein, it provided no formal educational program of any type on its own premises.

### The Fellowship Program

In 1946, plaintiff had inaugurated a fellowship program which it discontinued in 1955 due to the adverse effects of the draft and the Korean War. This fellowship program during those years comprised a 2-year course of training in research and advanced economics at the postgraduate level,[4] and from three to eight Fellows were in attendance at various times. Such training took the form of participation in active research projects on various economic problems. During their mornings, the Fellows in attendance rotated among the members of the faculty, gaining experience in the actual conduct of economic research. In the words of plaintiff's fellowship award notice, afternoons were spent in "study, research, and conference (class) periods." In its training program, plaintiff did not make use of the formal classroom method, as that concept is traditionally understood. Rather, its course instruction was accomplished in small conference groups attended by an instructor and three to five Fellows.

Such a conference was described by plaintiff's director as "a seminar period." Course grades were simply "satisfactory" or "unsatisfactory". Plaintiff's goal was "not a passing grade but research and writing of quality fit for publication as a part of the Institute's work." However, during the 9-year period of plaintiff's fellowship program, it appears that only two Fellows were credited with a part in any of plaintiff's publications.[5] Arrangements had been made by plaintiff, so that Fellows would be given some credit towards a doctorate in economics by Claremont Graduate School in California and The University of Washington.

Applications for a fellowship were secured through fellowship award announcements to all members of the American Economic Association, and the departments of economics in a number of colleges and universities. Each applicant was offered, if he should be chosen, free tuition and books plus an annual stipend. The stipend was scaled as follows: In the case of Fellows with a B. S. or B.A. degree, $1800 the first year and $2100 the second; for those with M.A. or M.S. degrees, $2000 and $2400; for those with Ph.D. or D.Sc. degrees, $2500 and $3000. During the period 1947–1950 this method of recruitment resulted in plaintiff's receipt of 60 or 70 applications each year of which 4 or 5 were accepted for the 2-year program. Fellows were required to be in attendance from Monday through Friday. They were given three weeks' summer leave. Fellows who failed to demonstrate fitness for continuing the program could be discharged by plaintiff on 30 days' notice. At the trial of this case, plaintiff's director testified that in the following month, the fellowship program would be revived with six Fellows in attendance, only two of whom, however,

3. Harwood, Reconstruction of Economics, p. 82.

4. Plaintiff has never had any undergraduate students in attendance.

5. These two Fellows were originally credited with co-authorship of Economic Tides and Trends, but by 1960 this credit had been removed apparently as a result of a revision to the book.

would receive the stipend above described.

### The Scholarship Program

Through the efforts of its director, the plaintiff was instrumental in the formation during 1955 of The Interfoundation Committee for Economic Scholarships. Three private foundations joined with plaintiff in a program designed to seek out the best students to be found in secondary, or high schools, and to interest them in the field of economic research, through an offer of scholarship awards in aid of college expenses. Plaintiff agreed to pay the expense necessary to administering the program and to provide any scholarships which the foundations were unable to provide at any given time. Plaintiff believed such program would provide a source of talented students for its then inactive fellowship program, and it agreed to set aside $50,-000 in the form of a fund available for fellowship stipends if and when such students had completed college and were accepted into plaintiff's fellowship program.[6] Plaintiff's director has always been an active member of this Committee.

In behalf of the Committee, plaintiff prepared and printed two brochures, including a form of application for scholarship, describing the details of the program. These were distributed by plaintiff annually to high school students throughout the country who, by reason of high-ranking grades in their academic courses, had been placed on the annual list of the National Merit Scholarship program. The Interfoundation Committee, acting through plaintiff as its administrative agency, made scholarship awards to 184 students during the academic year 1956–57 and to 219 students during the academic year 1957–58. The sums received by plaintiff from the Foundations for scholarship awards during the calendar years 1957 and 1958 totaled $43,535.46. For those same years, plaintiff paid out in scholarship funds the total sum of $32,625.00, or an average award of approximately $80 per student. At December 31, 1958, plaintiff's "Scholarship Account" showed a balance of $8.34. The record is inconclusive as to whether the difference of about $10,-900 between the scholarship funds so received by plaintiff and the awards so expended was used by plaintiff to defray its expenses of administering the fund or was placed in some investment account. In one year during the period 1955–60, plaintiff contributed to the scholarship program an amount somewhere between $12,000 and $14,000.

12. Any person paying the sum of $35 per year to plaintiff will receive its biweekly Investment Bulletin, its weekly Research Reports, and all its book publications currently available including annual revisions thereto. During the years 1957 and 1958, the plaintiff received the sums of $96,540.17 and $117,-300.78, respectively, from individuals subscribing for these publications on an annual basis. Plaintiff refers to these subscribers as its "Annual Sustaining Members." Plaintiff also received in 1957 and 1958 the sums of $132,226.59 and $157,544.31, respectively, from persons subscribing for the Investment Bulletin alone or for one of the plaintiff's investment services. The weekly research reports and many of plaintiff's treatises on economic problems are distributed free of charge to approximately 2,000 college, university and public libraries throughout the United States. The Investment Bulletin is not so distributed. Plaintiff accepts no outside advertising from any source but does carry extensive advertising of its own publications and services in its various books and periodicals. Plaintiff owns a printing press and related facilities located on its premises where it accomplishes about one-half its total printing requirements. The remainder of its printing is done by a printing establishment in Pittsfield, Massachusetts.

6. This sum was placed in an account called Special Reserve for Fellowships.

13. The following are condensations of pertinent parts of plaintiff's financial statements for the years involved herein:

*Receipts and Expenditures Statement*

|  | 1957 | 1958 |
|---|---|---|
| **CURRENT RECEIPTS** | | |
| Annual sustaining members | $96,540.17 | $117,300.73 |
| Sale of books: | | |
| What Will Deflation or More Inflation Mean to You? | 10,032.66 | 12,007.81 |
| Life Insurance from the Buyer's Point of View | 21,848.09 | 17,350.69 |
| How To Make Your Budget Balance | 1,293.43 | 1,460.02 |
| What Will Social Security Mean to You? | 17,316.58 | 1,145.35 |
| Current Economic Trends | 4,674.48 | 6,566.88 |
| Cause and Control of the Business Cycle | 140.83 | 175.57 |
| Investment Trusts and Funds from the Investor's Point of View.. | 11,545.74 | 13,977.66 |
| How To Avoid Financial Tangles | 58,970.27 | 60,617.37 |
| How To Invest Wisely | 8,914.34 | 11,209.50 |
| Economic Tides and Trends | 105.95 | 92.74 |
| Where Will Tomorrow's Opportunities Be? | 265.95 | 116.90 |
| Reconstruction of Economics | 48.04 | 62.73 |
| Useful Economics | 7,144.91 | 200.45 |
| The Counterrevolution | 76.27 | 78.58 |
| Bulletins and Services: | | |
| Research reports | 3,620.35 | 6,687.17 |
| Investment bulletins and services | 132,226.59 | 157,544.31 |
| Insurance advice | 71.13 | 170.00 |
| **OTHER CURRENT RECEIPTS** | | |
| Scholarship donations | 29,258.34 | 14,277.12 |
| Fellowship donations | 5,100.00 | 5,315.00 |
| Social Security taxes withheld | 2,284.45 | 2,405.62 |
| Personal income taxes withheld | 16,408.52 | 18,597.96 |
| Subsistence | 4,056.86 | 3,481.30 |
| Transportation | 2,772.89 | 3,224.65 |
| Building, Current | 725.63 | 575.90 |
| Miscellaneous | 3,026.52 | 7,099.86 |
| Income from Investments | 4,290.00 | 5,303.36 |
| Returned IFC Checks | 375.00 | 400.00 |
| Total Current Receipts | 443,133.98 | 467,445.28 |
| **CURRENT EXPENDITURES** | | |
| Salaries | 143,896.67 | 156,212.66 |
| Scholarships | 17,125.00 | 15,500.00 |
| Postage | 68,021.36 | 72,913.13 |
| Paper | 50,707.75 | 63,266.30 |
| Printing | 25,502.22 | 36,253.03 |
| Subsistence | 9,372.16 | 8,251.84 |
| Transportation | 6,192.54 | 6,252.34 |
| Personal income taxes withheld | 18,242.56 | 20,655.62 |
| Social Security taxes | 2,284.45 | 2,405.62 |
| Building, Current | 6,600.46 | 7,029.20 |
| Miscellaneous | 24,451.63 | 29,897.09 |
| List Rentals | 28,521.93 | 25,822.94 |
| Local Taxes | 1,346.00 | 1,792.00 |
| Hosp. Ins. Uncollected | 10.80 | .......... |
| Total Current Expenditures | 402,276.13 | 446,251.77 |

*Annual Financial Statement as of December 31, 1958*

### Assets

| | | |
|---|---:|---:|
| Checking account and petty cash | | $6,835.05 |
| Federal Savings and Loan accounts | | 10,000.00 |
| Segregated assets (friends of AIER fellowship fund) | | 68,000.00 |
| Other investments | | 9,501.00 |
| Accounts receivable less overdue accounts | | 834.56 |
| Prepaid mailing expenses | | 5,500.00 |
| Inventory—Books, supplies, food, etc. | | 20,038.73 |
| Value of buyers list | | 63,056.50 |
| Machinery and equipment | $112,982.47 | |
| Less depreciation reserve (500/mo) | 49,052.24 | |
| Net machinery and equipment | | 63,930.23 |
| Real estate including buildings | $100,709.22 | |
| Less depreciation reserve (300/mo) | 14,150.00 | |
| Net fixed property | | 86,559.22 |
| Prepaid insurance | | 194.90 |
| Goodwill | | 1.00 |
| Total assets | | 334,451.19 |

### Liabilities

| | |
|---|---:|
| Accounts payable | $8,907.00 |
| Due U. S. for taxes withheld and social security | 2,100.88 |
| Reserve for unexpired subscriptions | 70,515.43 |
| Reserve for advance contributions of ASMs | 46,911.11 |
| Scholarship account | 8.34 |
| Special reserve for fellowships | 103,206.76 |
| Friends of AIER fellowship fund | 68,000.00 |
| General reserve, unallocated | 34,801.67 |
| Total liabilities | 334,451.19 |

14. Mr. E. C. Harwood, heretofore referred to as a cofounder of plaintiff, is also its director and cotrustee. As director, he also serves as chairman of the faculty, which comprises 14 members and which, in addition to its research activities, acts as plaintiff's governing body in a manner similar to a corporate board of directors. Since his graduation in 1920 from the United States Military Academy, Mr. Harwood's major academic interest has been in the field of economics. He has either written, or participated in the writing of, nearly all major publications issued by plaintiff. He has developed a statistical and graphic method of measuring inflation and deflation in the economy known as the "Harwood Index of Inflation."

In organizing the plaintiff, Mr. Harwood believed, and still does believe, that his concept of soliciting financial support from a large number of individuals rather than from only a few wealthy sources would have the salutary result of freeing plaintiff's management, faculty, and research workers from possible bias in their analyses of economic problems. This concept resulted in plaintiff's system of "Annual Sustaining Members" who pay plaintiff $35 a year for which they are entitled to receive, if desired, all of plaintiff's publications. The number of annual sustaining members has ranged from a low point of 300 during World War II [7] to the present number of 4500. In recent years a small number of these have volunteered their services by interviewing students under the scholarship program described above in order to keep plaintiff in touch with the student's scholastic programs and progress. In addition to amounts received from annual sustaining members and from sales of its publications, plaintiff has received one individual grant of $60,000 for the fellowship program and an annual $5,000 contribution from one foundation for the past 11 years. Although plaintiff's Certificate of Incorporation, Agreement of

7. No publications were issued by plaintiff during the period of World War II.

Association, and Bylaws make no specific provision for the distribution of plaintiff's net assets in the event of liquidation or dissolution, Mr. Harwood interprets the Bylaws as requiring court approval on any such distribution, and he believes that the net assets would be distributed to the National Bureau of Economic Research.

15. In his capacity as the original trustee, Mr. Harwood is empowered to employ, discharge, and determine the compensation of members of the faculty, subject to the approval of the majority of the faculty then in office. No part of plaintiff's real or personal property can be disposed of without his consent in writing, except for sales in the ordinary course of business. He has the power to manage plaintiff's properties in accordance with instructions from the faculty, and in the event of disagreement between him and the faculty in this respect, provision is made in the Bylaws for obtaining a solution of the disagreement by a court of competent jurisdiction. In his capacity as trustee, Mr. Harwood is entitled to life tenure with plaintiff. During the years involved herein, Mr. Harwood's annual compensation covering all of his offices with plaintiff totaled about $18,000. Annual salary to the next highest paid employee was $12,000.

16. Plaintiff has never engaged in the carrying on of propaganda or otherwise attemping to influence legislation, nor has it participated in, or intervened in, any political campaign on behalf of any candidate for public office.

17. Prior to 1957, plaintiff had accumulated certain funds, a portion of which was invested by it in 1200 shares of common stock of the Tri-Continental Corporation, an investment trust. During the calendar years 1957 and 1958, these shares became entitled to a proportionate share of the undistributed capital gains earned by that company for those years in the amounts of $924 and $2,040, respectively. The Tri-Continental Corporation paid to the United States, on plaintiff's account, income taxes on said undistributed capital gains in the amount of $231 for 1957, and $510 for 1958, said taxes being computed at the rate of 25 percent.

On November 4, 1959, plaintiff timely filed its claims for refund of the full amount of the taxes so paid on its behalf by the Tri-Continental Corporation, citing as grounds therefor its alleged tax exempt status. On December 4, 1959, both claims were disallowed in full by the District Director, Internal Revenue Service, New York, N. Y. Thereafter, plaintiff timely filed its petition in this court.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.