PRESBYTERIAN & REFORMED PUBLISHING CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1759–81X.     Filed December 23, 1982.

---

[7]See also *Rothfeld v. Commissioner*, T. C. Memo. 1980–362.

*Susan M. Clapp,* for the petitioner.
*William F. Halley,* for the respondent.

FEATHERSTON, *Judge:*[1] Respondent retroactively revoked petitioner's status as an organization exempt from Federal income tax under sections 501(a) and 501(c)(3).[2] Petitioner challenges respondent's revocation and has invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7428. The issues presented are whether petitioner was operated exclusively for an exempt purpose within the meaning of section 501(c)(3), and, if not, whether the Commissioner abused his discretion in making revocation retroactive to January 1, 1969.

## FINDINGS OF FACT[3]

At the time it filed the petition in this case, Presbyterian & Reformed Publishing Co. (petitioner) maintained its principal

---

[1]This case was tried before Judge Sheldon V. Ekman who died Jan. 18, 1982. By order of the Chief Judge, the case was assigned to Judge C. Moxley Featherston for disposition.

[2]All section references are to the Internal Revenue Code of 1954 as in effect during the tax years in issue, unless otherwise noted.

[3]The record in this case consists of the administrative record, stipulated exhibits, and the trial transcript. Because this case involves the revocation of tax-exempt status (where the Commissioner undertakes his own fact finding) rather than the initial denial of tax-exempt status (where the Commissioner accepts as true the statements of the organization, as contained in the administrative record), a trial concerning contested factual issues was, therefore, warranted. See Rule 217(a), Tax Court Rules of Practice and Procedure, and the notes thereto.

place of business at Marble Hill Road, Harmony, N.J. It was incorporated on January 21, 1931, under the laws of the State of Pennsylvania. The certificate of incorporation states that petitioner was "formed for the purpose of the transaction of a printing and publishing business." Of the three original incorporators, shareholders, and directors, Samuel G. Craig (Samuel) received 48 shares out of the 50 shares of no par value stock issued.

At the first meetings of incorporators and of directors, held on February 5, 1931, Samuel was elected chairman of the board of directors as well as president and treasurer of petitioner. The bylaws unanimously adopted at the incorporators' meeting included a provision (paragraph 21) stating that directors would receive no stated salary for their services (although this could be altered by resolution), but that nothing precluded a director "from serving * * * in any other capacity and receiving compensation therefor." Another provision grants the directors power to establish and change the salaries of petitioner's officers.

Paragraph 38 of the bylaws restricts the sale and transfer of stock and waives the "right of the owners or holders thereof to receive pecuniary return by way of dividends." The paragraph provides petitioner with buy-back rights for all shares, and notice of these restrictions was endorsed on each share of stock. Paragraph 38 explains the waiver of dividends and sets forth petitioner's purposes as follows:

(A) In order to further and effectuate the primary purpose of the Company to state, defend and disseminate (through every proper means connected with or incidental to the printing and publishing business) the system of belief and practice taught in the Bible, as that system is now set forth in the Confession of Faith and Catechisms of the Presbyterian Church in the United States of America, each owner or holder of any of the stock of this Company waives the right to receive dividends thereon and agrees that any income which might otherwise be available for the payment of dividends shall be applied by the Board of Directors for the improvement of the form and quality or for the extension of the influence of its publications, or for the publication of the writings of others either for gratuitous or paid distribution, or otherwise, by donation, gift to, or endowment of any agency or institution engaged in the teaching or inculcating of said system of belief and practice.

The bylaws were amended by unanimous vote of the stockholders in attendance on January 1, 1976, in the following manner:

46. If the Presbyterian and Reformed Publishing Co., Inc., a non-profit organization, should ever be dissolved, its assets will be given to the Westminster Theological Seminary, Philadelphia, PA. * * * This theological seminary, like the Presbyterian and Reformed Publishing Co., is a non-profit organization and is also dedicated to the defense of Biblical Christianity as set forth in the Westminster Confession of Faith.

On December 12, 1939, the Internal Revenue Service issued a determination letter which granted petitioner an exemption from Federal income taxation under the provisions of section 101(6) of the Revenue Act of 1936.[4] In this determination letter, the Deputy Commissioner of Internal Revenue made the following factual finding to support his determination:

Your actual activities consist of publishing a religious paper known as "Christianity Today", a Presbyterian journal devoted to stating, defending, and furthering the gospel. Your income is derived from subscriptions, contributions and gifts and is used to defray maintenance and general operating expenses.

The letter further states that petitioner was not required to file returns for 1937 and subsequent years—

so long as there is no change in your organization, your purposes, or your method of operation.

Any changes in your form of organization or method of operation, as shown by the evidence submitted, must be immediately reported to the collector of internal revenue for your district in order that the effect of such changes upon your exempt status may be determined.

Petitioner has been predominantly a family-run concern, with its presidency passing in 1953 from Samuel to his son, Charles H. Craig (Charles);[5] and since 1976, Charles' son, Bryce Craig (Bryce), has been a full-time employee and officer.

Although Charles never received a degree in theology, both Samuel and Bryce graduated from theological seminary,

---

[4]According to this determination letter, petitioner had originally applied for and been granted tax-exempt status on Dec. 28, 1935, under the revenue act then in force. In a subsequent ruling dated Feb. 1, 1939, the exemption was revoked, apparently because of concern that part of petitioner's earnings might inure to the benefit of private stockholders or individuals. After par. 38 of the bylaws was brought to the Deputy Commissioner's attention, the Feb. 1, 1939, revocation ruling was itself revoked in this Dec. 12, 1939, letter.

[5]At Samuel's death in 1960, all of his stock in petitioner passed by his will to Charles.

Samuel from Princeton and Bryce, in 1974, from Westminster Theological Seminary (Westminster). (Westminster, like petitioner, is committed to Presbyterian "reformed" doctrine as set forth in the Westminster Confession of Faith.) While petitioner is not affiliated with any particular church, its link to reformed Presbyterian doctrine is evident in its bylaws and the commitment of its stockholders, officers, and directors. Among 12 more recent members of the board of directors, nearly all had some overt religious affiliation: 4 were, or had been, church pastors, and 4 were in some way connected with Westminster. None received compensation for their services as directors.

Neither Samuel nor Charles ever received any compensation from petitioner. Petitioner has received volunteer help in manuscript reading and editing, packing and shipping books, and clerical duties from various individuals over the past 20 to 25 years. While the actual printing has always been done by an independent printer, for many years Charles himself performed numerous pre-printing tasks: He read the mail, prepared and typed invoices, unloaded books from trucks, read manuscripts and edited them, read proofs, and arranged for artists to work on the book covers.

In 1976, Bryce began working full-time as treasurer and assistant director. He and his father shared the duties of managing petitioner's day-to-day operations from 1976 through the first part of 1978. Thereafter, Bryce assumed full management and Charles became semiretired, visiting petitioner's facility only about once or twice a week. In contrast to his father and grandfather, Bryce received salaries from 1976 to 1979, inclusive, of $12,000, $13,250, $15,000 and $15,350. As of the beginning of 1979, none of the seven other employees received annual salaries over $12,500, and five were paid under $6,250;[6] the two most highly paid were hired in 1978 for

---

[6]The annual salaries at the beginning of 1979 break down as follows:

|  | *Full-time* |  |
|---|---|---|
| E. Davis | Manager shipping and packing department | $12,500 |
| T. Notaro | Assistant editor | 10,000 |
| Abby Rice | Shipping and secretarial | 6,240 |
|  | *Part-time* |  |
| Ruth Sturm | Secretarial and accounting | 1,440 |
| B. Cuomo | Secretarial $3.50/hr.—24 hrs. a week | (¹) |

newly created positions. The wages and salaries paid by petitioner rose from under $550 in 1972 to about $16,200 (including commissions) in 1976 to about $57,600 in 1979.[7]

Petitioner's publishing operations were initially run out of Samuel's house and later out of Charles' house in Nutley, N.J. Neither Samuel nor Charles received any payment or reimbursement for expenses. After Charles became a director and assumed more responsibilities, he concluded that his house in Nutley, N.J., was not "adequate to carry on the publishing business." Correspondence and proofs covered the dining room table; the telephone rang frequently; storage space (in a former grocery store) was insufficient. To alleviate the problem, in 1969 Charles and his wife personally purchased a house with a cinderblock truck garage in East Orange, N.J., for approximately $30,000. Petitioner's operations were moved to the garage while the house was rented to people unconnected with petitioner. Charles paid fire and liability insurance on the house and garage from 1969 through 1978 (the period in which he owned the property); and in 1970 he purchased and had installed a heating system for the garage at a cost of $1,460. He also received rent from petitioner sufficient to

| C. Notaro | Secretarial $3.50/hr.—16 hrs. a week | ([1]) |
| D. Hengst | Secretarial $2.90/hr.—5 hrs. a week | ([1]) |

[1] The record does not reveal the number of weeks worked. Charles and his wife volunteered their services—Mrs. Craig for 10 hours a week.

[7] The annual amounts petitioner paid as salaries (rounded for convenience) are as follows:

| Year | Amount paid |
| --- | --- |
| 1969 | 0 |
| 1970 | 0 |
| 1971 | $300 |
| 1972 | 549 |
| 1973 | 2,285 |
| 1974 | 3,409 |
| 1975 | 6,988 (includes commissions) |
| 1976 | 16,197 (includes commissions) |
| 1977 | [1] 23,954 |
| 1978 | 35,230 |
| 1979 | 57,597 |

[1] There appears to be a slight discrepancy regarding the figure for compensation paid in 1977. Petitioner's Form 990 lists salaries as $23,954 when listing all expenses, but also shows officer's compensation as $13,250 and other salaries and wages as about $11,456, for a total of $24,706. As the Form 990 is ambiguous and petitioner did not object to respondent's request for the lower figure, we shall accept it.

cover the real estate taxes he personally paid while leaving a modest excess for other expenses.[8] This garage, along with Charles' home, was used by petitioner until March 1978, after which the garage property was sold, at a loss, for $28,000.

As early as March 2, 1974, petitioner informed the Internal Revenue Service (IRS) that it was accumulating a surplus for a "building fund" and that it planned to purchase or build an office and warehouse. This statement was reasserted in nearly all future correspondence with the IRS and in the filed Forms 990 for the years 1975 through 1977. In 1976, petitioner purchased 5½ acres of land in Harmony, N.J., and, after obtaining a variance and clarifying title to the property, construction began on a combined office and warehouse building in 1977. The building was completed in 1978, at a total cost as follows:

| | |
|---|---|
| Land | $27,783 |
| Land improvements | 10,106 |
| Building | 225,025 |
| Total | 262,914 |

In 1979, petitioner purchased the following for use in its operations:

| | |
|---|---|
| Furniture and fixtures | $4,949 |
| Transportation equipment | 10,390 |
| Electronic accounting machine | 11,940 |
| Total | 27,279 |

Payment for the new building and improvements were all

---

[8]

| Year | Real estate taxes paid by Charles[1] | Rent paid by petitioner to Charles |
|---|---|---|
| 1970 | ([2]) | $1,420 |
| 1971 | ([2]) | 1,800 |
| 1972 | $1,667 | 2,160 |
| 1973 | ([2]) | 1,800 |
| 1974 | 2,238 | 2,400 |
| 1975 | 2,355 | 2,400 |
| 1976 | 2,583 | 2,600 |
| 1977 | 2,322 | 3,000 |
| 1978 | | 750 |

[1] All figures are rounded.
[2] The stipulation provides no information concerning this year.

made out of petitioner's retained earnings. Prior to 1969, petitioner had made no profits; indeed, Samuel and Charles sometimes made donations to petitioner to cover expenses. (Samuel donated $500 in 1939 and $3,000 in 1954, and between 1955 and 1963, Charles donated $19,600.) Petitioner's profits expanded greatly from 1969 through 1979 as is evident from its Forms 990[9] showing income and expenses relating to book sales as follows (generally figures in charts and in text are rounded to nearest dollar):

| Year | Gross sales of books | Cost of goods sold | Gross profit from book sales | Expenses (not including cash contributions paid or building expenses) | Net profit from book sales |
|---|---|---|---|---|---|
| 1969 | $116,684 | $96,037 | $20,647 | $17,542 | $3,105 |
| 1970 | 120,562 | 80,203 | 40,359 | 26,394 | 13,965 |
| 1971 | 177,163 | 112,740 | 64,423 | 30,075 | 34,348 |
| 1972 | 221,966 | 167,404 | 54,562 | 32,294 | 22,268 |
| 1973 | 228,297 | 137,978 | 90,319 | 39,554 | 50,765 |
| 1974 | 278,665 | 170,649 | 108,016 | 55,443 | 52,573 |
| 1975 | 412,880 | 234,957 | 177,923 | 71,743 | 106,180 |
| 1976 | 502,234 | 302,749 | 199,485 | [1] 95,284 | 104,201 |
| 1977 | 454,961 | 259,187 | 195,774 | 143,906 | 51,868 |
| 1978 | 631,939 | 392,619 | 239,320 | 182,448 | 56,872 |
| 1979 | 712,215 | 408,966 | 303,249 | 236,109 | 67,140 |

[1] It appears that $4,056 included in expenses in 1976 was spent as part of the initial cost of acquiring the Harmony land. The cost of the land, however, is stipulated as $27,783 and this amount was listed as a building expense on petitioner's 1977 Form 990. Since respondent accepts the $95,284 figure as book sales expenses in 1976, we shall do the same.

Between 1969 and 1979, petitioner received additional income in the form of interest, dividends,[10] and contributions, made cash contributions, and maintained yearend cash-on-hand balances as follows:

[9] Prior to 1969, petitioner filed no information returns, relying on the 1939 letter stating that barring a change in circumstances, no filing was necessary. In late 1971, Charles wrote to the IRS inquiring if any kind of return was required. Upon affirmative answer, he immediately filed back returns for 1969 and 1970, and has continued to file information returns for subsequent years.

[10] Petitioner received dividends of $698 in 1979. For simplicity, we include this with interest income in the chart.

| Year | Interest and dividends | Contributions received | Contributions made | Net income[1] | Cash-on-hand |
|------|------|------|------|------|------|
| 1969 | 0 | $11,785 | 0 | $14,890 | $14,890 |
| 1970 | 0 | 3,550 | 0 | 17,515 | 32,405 |
| 1971 | 0 | 8,624 | 0 | 42,972 | 54,876 |
| 1972 | 0 | 3,650 | 0 | 25,918 | 76,294 |
| 1973 | 0 | 0 | 0 | 50,765 | 128,905 |
| 1974 | $3,663 | 0 | $500 | 55,736 | 184,640 |
| 1975 | 7,780 | 0 | 0 | 113,960 | 298,601 |
| 1976 | 15,042 | 0 | 0 | 119,243 | 417,844 |
| 1977 | 17,898 | 0 | 200 | 69,566 | 243,930 |
| 1978 | 9,135 | 0 | 12,672 | 53,335 | 208,200 |
| 1979 | 14,194 | 2,283 | 64,000 | 19,617 | 111,826 |

[1] Net profits on book sales plus interest and dividends plus contributions received less contributions made. Building expenses are not subtracted from these figures.

Petitioner made non-interest-bearing loans in 1971 and 1972 to Harmony Press, a printer that did a "considerable" amount of petitioner's printing, as well as printing for another organization committed to the same doctrinal position as petitioner. These loans totaled $20,500 in 1971 and $4,500 in 1972, with repayments of $2,000 in 1974, $2,000 in 1975, and $7,600 in 1979.

As stated, petitioner is committed to Presbyterian reformed doctrine as exemplified by the Westminster Confession of Faith and the manuscripts selected for publication reflect this doctrinal position. The main criterion petitioner uses to decide on a manuscript's publication is whether the book would make a "worthy contribution * * * to the reformed community." If a manuscript complies with this editorial standard, petitioner may publish the book despite petitioner's estimate that it will not sell many copies, although if the book will not sell at all, petitioner will reject it. Petitioner has published and reprinted at least a few books rejected by other companies because they were too rigid doctrinally or uneconomical (i.e., the turnover of the book was too slow or subsidies from authors were requested in the forms of a purchase order or a monetary advance). Petitioner published one author, Jay Adams, whose books consistently sold well.

Once a decision is made to publish a book, petitioner arranges to have printed a particular number of copies, depending on what Charles or Bryce believes can be sold in approximately 2 years (based on sales of similar titles) and any quantity discounts. Petitioner rarely sold its books at list price

(price before any discount) but rather generally sold at discounts ranging from 40 to 50 percent off list price for sales to book stores, 50 to 60 percent off list price for sales to wholesalers, and 30 to 50 percent off list price for sales to certain individuals.

In setting their list prices, certain publishers compute a book's unit price (the cost of printing plus overhead, artwork, editorial costs, and freight, divided by the number of copies printed) and multiply this by a certain set cost ratio figure (cost ratio equals list price divided by unit price). At least one publisher of Bryce's acquaintance used a set cost ratio of 8, while two others used cost ratios of 5. (One publisher using a ratio of 5 was a nonprofit company.) Bryce, in contrast, computes unit price by considering only the printer's bill (printing costs plus, in a first edition, typesetting costs) without adding in overhead. He also prefers not to rely directly on cost ratio, but rather sets list prices after calculating the margin between petitioner's costs and projected receipts on a sale at a 60-percent discount from a tentative list price. The final list price, then, is set to generate a certain profit margin. This margin is never less than zero on petitioner's maximum discount; that is, on a 60-percent discount sale, petitioner plans not to lose money. In general, petitioner's cost ratio was approximately 4.

From the money received on sales, petitioner had to pay royalties to somewhat less than one-half of the authors and, of course, meet other expenses. After a total of $350 in royalty payments in 1969, from 1975 to 1978 annual royalty payments grew from $37,020 to $41,633, $70,269, $70,765, respectively, and reached $82,127 in 1979. Petitioner's relationship with its authors has been in general quite informal, with some books published under informal agreements rather than formal contracts. Most authors did not receive royalties; those who did were, however, usually under contract. Recently petitioner has attempted to make more formal arrangements with authors.

In 1977 or 1978, petitioner did some advertising, placing an advertisement for a mission book in a magazine. From about

1968 through 1977, petitioner also offered membership in a sort of book club.[11] This book club was discontinued in 1978 because it was both unnecessary (in general, most individuals wanting to buy the books could buy at a discount without becoming a member) and a money-loser (at least in part because petitioner paid postage). Much of petitioner's "advertising" was effected by "word of mouth," with petitioner's maintaining a mailing list of people who write asking about books. Bryce has attempted to be more aggressive and seek out people interested in petitioner's books.

In order to supplement its book list, since 1975, petitioner has purchased books espousing a reformed viewpoint from other publishing companies. In turn, other publishers, particularly Baker Book House, have sometimes bought books from petitioner. From 1975 through 1977, petitioner's purchases for resale averaged about $27,000, but in 1978 and 1979, it spent $65,855 and $84,568, respectively, for resale books. In 1975, petitioner offered for sale well over 250 titles of about 100 different authors, plus a 12-volume "modern thinker" series.[12] Bryce knew of no other publishing company in the United States dedicated to the reformed Presbyterian doctrines, although one British company, Banner of Truth, which did mostly reprints, had a distributor in Pennsylvania.

At least as early as 1975, petitioner donated books to individuals who requested them. No itemized list of books donated (with petitioner's costs and postage paid) was included on the Forms 990, although the books' costs were included in the cost of goods sold. In addition, in most years after 1975, petitioner made cash contributions to groups involved in disseminating, at least in part, reformed Presbyterian doctrine.[13] These contributions swelled from $500 and $200 (in

---

[11]Simply by ordering one book (at discount rates of $1 and $3), one became entitled to 40-percent discounts on other books, and received lists of special offers at 80-percent discounts. Petitioner paid all postage. Members had no obligation to buy, and paid no membership fees; if, however, a member did not order for more than 12 months, his name was dropped from the mailing list.

[12]While the record generally does not indicate the average number of copies printed of the various titles, it is stipulated that, of the books written by Loraine Boettner, petitioner printed (from 1958 to the present) 305,000 copies, half of which were sold back to the author at petitioner's cost.

[13]Cash contributions in 1978 and 1979 included the following donations:

1974 and 1977) to $12,672 and $64,000 (in 1978 and 1979). Petitioner is currently maintaining a cash reserve of $180,000 to $200,000 in order to pay the tax liability in this case, should the Commissioner's retroactive revocation be upheld.

In a letter dated June 21, 1976, to petitioner, the Chief of the Exempt Organization Returns Branch requested additional information as to the reason petitioner was "not a private foundation." Following further correspondence, the District Director informed petitioner by letter dated June 9, 1978, that an adjustment (modification or revocation) of its exempt status was believed to be necessary. The final revocation letter, dated October 28, 1980, determined that exemption was revoked on the grounds that petitioner was not "operated exclusively for purposes set forth in section 501(c)(3)" and was "engaged in a business activity which is carried on similar to a commercial enterprise." This letter further stated that the "effective date of the revocation is January 1, 1969."

OPINION

An organization is entitled to exemption from Federal income taxes under section 501(a) and (c)(3) if, among other things, it is organized and operated exclusively for exempt purposes. In this case, respondent determined that petitioner failed to meet the operational requirement.[14] Under this

| Year | Amount | Donee |
| --- | --- | --- |
| 1978 | $2,000 | The Advocate—book ministry for inner city pastors |
| 1978 | 10,600 | Westminster Theological Seminary |
| 1979 | 16,000 | Orthodox Presbyterian Church Foreign Missions |
| 1979 | 2,000 | Reformation Translation Fellowship—translations of English books (reformed) into Chinese for distribution in Chinese-speaking countries |
| 1979 | 10,000 | Philmont Christian Academy—for high school library honoring Dr. Van Til, one of petitioner's authors |
| 1979 | 10,000 | Christian Counseling and Educational Foundation— Christian counseling center |
| 1979 | 25,000 | Westminster Theological Seminary |

[14]Even if petitioner failed to meet the organizational test (sec. 1.501(c)(3)–1(b), Income Tax Regs.), this would not provide a basis for revocation because petitioner's exemption was granted before July 27, 1959. Sec. 1.501(c)(3)–1(b)(6), Income Tax Regs.

requirement, "the purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization." *B.S. W. Group, Inc. v. Commissioner,* 70 T.C. 352, 356–357 (1978). See *est of Hawaii v. Commissioner,* 71 T.C. 1067, 1078–1079, affd. 647 F.2d 170 (9th Cir. 1981). Whether an organization satisfies the operational test is a question of fact. Eg., *est of Hawaii v. Commissioner, supra* at 1079; *B.S. W. Group, Inc. v. Commissioner, supra* at 357.

Where an organization engages in only one activity, that activity may further multiple purposes, exempt and nonexempt. Because exemption will be granted only if an entity is organized and operated "exclusively"[15] for exempt purposes, the presence of a "single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes." *Better Business Bureau v. United States,* 326 U.S. 279, 283 (1945); sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. See *Copyright Clearance Center, Inc. v. Commissioner,* 79 T.C. 793 (1982).[16] If no substantial nonexempt purpose exists, the income from a trade or business may be exempt if the activity is carried on in furtherance of an exempt purpose. See, e.g., *Industrial Aid for the Blind v. Commissioner,* 73 T.C. 96 (1979); *Peoples Translation Service v. Commissioner,* 72 T.C. 42 (1979); sec. 1.501(c)(3)–1(e)(1), Income Tax Regs.

We must, then, decide toward what ends petitioner's activities are directed and whether they are "animated" by a substantial commercial purpose. *Better Business Bureau v. United States, supra* at 284. Where a nonexempt purpose is not an expressed goal, courts have focused on the manner in which activities themselves are carried on, implicitly reasoning that

---

[15]As is apparent from the quotation in the text, "exclusively" is not construed to mean "solely" or "absolutely without exception." *Church in Boston v. Commissioner,* 71 T.C. 102, 107 (1978).

[16]While some cases have relied on a test analyzing whether an organization has a "primary" rather than a "substantial" nonexempt purpose (a difference which may be merely semantic, see *est of Hawaii v. Commissioner,* 71 T.C. 1067, 1079 (1979), affd. 647 F.2d 170 (9th Cir. 1981)), we have recently stated that the "substantial in nature" test must control. *Copyright Clearance Center, Inc. v. Commissioner,* 79 T.C. 793 (1982); *Better Business Bureau v. United States,* 326 U.S. 279, 283 (1945).

an end can be inferred from the chosen means. If, for example, an organization's management decisions replicate those of commercial enterprises, it is a fair inference that at least one purpose is commercial, and hence nonexempt. And if this nonexempt goal is substantial, tax exempt status must be denied.

Clearly, petitioner's conduct of a growing and very profitable publishing business must embue it with some commercial hue. How deep a tint these activities impart can best be evaluated by looking at certain factors deemed significant in cases involving religious publishing companies, as well as in other pertinent cases.[17] While we are sympathetic to petitioner, we hold that, judged by the manner in which it ran its activities, it possessed a nonexempt commercial purpose that was substantial in nature.

First, among the factors indicating nonexempt purpose is the presence of substantial profits. While not determinative, such profits constitute "evidence indicative of a commercial character." *Scripture Press Foundation v. United States,* 152 Ct. Cl. 463, 285 F.2d 800, 803 (1961); *Inc. Trustees of Gospel Wkr. Soc. v. United States,* 510 F. Supp. 374, 378 (D. D.C. 1981), affd. 672 F.2d 894 (D.C. Cir. 1981); see *B.S.W. Group, Inc. v.*

---

[17]In recent years, numerous cases have arisen concerning the tax-exempt status of organizations that publish and sell religious literature. Predictably, results have varied. Cases upholding tax-exempt status include the following: *Elisian Guild, Inc. v. United States,* 412 F.2d 121 (1st Cir. 1969) (organization's exempt purpose in undertaking its sole activity of publishing and distributing religious works of one woman transcended any profit motive); *Pulpit Resource v. Commissioner,* 70 T.C. 594 (1978) (petitioner's sole activity was publishing and selling a religious journal, not in competition with other enterprises, with the primary exempt purpose of improving preaching skills of the clergy); *Saint Germain Foundation v. Commissioner,* 26 T.C. 648 (1956) (organization's sale of religious publications was incidental to its religious purposes as manifested through the conduct of religious classes and conclaves). Denying tax exemption were: *Christian Manner International v. Commissioner,* 71 T.C. 661 (1979) (petitioner's primary, if not sole, activity was the promotion, distribution, and sale of its founder's books, with the principal nonexempt goal of realizing a profit); *Inc. Trustees of Gospel Wkr. Soc. v. United States,* 510 F. Supp. 374 (D. D.C. 1981), affd. 672 F.2d 894 (D.C. Cir. 1981) (organization had nonexempt purpose of making profits by involvement in publishing nondenominational religious literature, sold similarly to commercial publishers at substantial profits); *Fides Publishers Assn. v. United States,* 263 F. Supp. 924 (N.D. Ind. 1967) (organization's sole activity had substantial nonexempt purpose of publishing and selling denominational religious literature at a profit); *Scripture Press Foundation v. United States,* 152 Ct. Cl. 463, 285 F.2d 800 (1961) (organization's primary concern was selling religious literature for profit and its door-to-door evangelism and religious instructional activities were merely incidental). See *Pulpit Resource v. Commissioner, supra* at 604–608 for a more extensive discussion of some of these cases.

*Commissioner,* 70 T.C. at 357. Petitioner's net profits from book sales soared dramatically in the decade between 1969 and 1979, rising from $3,105 in 1969 to a yearly high of $106,180 in 1975, then leveling off to between $51,869 and $67,140 in 1977 through 1979. Cash on hand reached $417,844 in 1976, before being reduced by the cost of building the Harmony plant to $208,200 in 1978 and then to $111,826 in 1979.

An important related factor was petitioner's method of pricing the books it sold. Again, this factor is not determinative, but whether an organization provides its publications below cost is a factor to be considered. *Peoples Translation Service v. Commissioner, supra* at 50. Petitioner's pricing policy was not designed to realize the maximum profit, but many books were sold substantially above cost. Bryce testified that list prices were set after he calculated the margin between petitioner's costs and projected receipts on sales at 60-percent off list price. This margin was designed never to be less than zero, so that petitioner never planned to sell books below cost. It is unclear whether this pricing to break even on maximum discount sales prevailed for all books or whether some books were priced to realize a profit even on 60-percent discount sales; but, in any event, it is clear that such a policy would necessarily generate profits on petitioner's 30- to 50-percent discount sales. We note, moreover, that from 1970 through 1979, petitioner showed sizable net profit margins on its book sales:[18] After a low of 3 percent in 1969, net profit grew to an annual high of 26 percent in 1975, with yearly averages from 1975 through 1979 at a solid 15.2 percent.

Since price setting is an important mechanism through

-----

[18]Net profit margin is computed by dividing net profit by gross receipts, and gross profit margin by dividing gross profit by gross receipts. See *Industrial Aid for the Blind v. Commissioner,* 73 T.C. 96, 99 (1979). The gross and net profit figures (based on the chart in our findings) were as follows:

| | | | | *Gross profit margin (percentage)* | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *1969* | *1970* | *1971* | *1972* | *1973* | *1974* | *1975* | *1976* | *1977* | *1978* | *1979* |
| 18 | 33 | 36 | 25 | 40 | 39 | 43 | 40 | 43 | 38 | 43 |

| | | | | *Net profit margin (percentage)* | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *1969* | *1970* | *1971* | *1972* | *1973* | *1974* | *1975* | *1976* | *1977* | *1978* | *1979* |
| 3 | 12 | 19 | 10 | 22 | 19 | 26 | 21 | 11 | 9 | 9 |

The decrease in net profit margin in 1977–79 resulted largely from increases in salary and royalty expenses, rather than from an alteration of its pricing practices (gross profit margins did not decline).

which companies control profits, we consider it very significant that, generally speaking, petitioner established prices which not only earned sizable profits, but which did so at consistent and comfortable net profit margins. Petitioner did not explain why, when its policies so obviously yielded such profits and profit margins, it continued in this method of pricing. For example, when it became clear that Jay Adams' works were relatively popular, no evidence indicates that petitioner decreased prices to encourage more sales to new readers or that it ever considered and, for good reason, rejected such a course. Rather, the evidence tends to show that petitioner wished to obtain a substantial profit from its most salable author.

Also significant is competition with commercial publishers, deemed to be "strong evidence of the predominance of nonexempt commercial purposes." *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. at 358; see *American Institute for Economic Research v. United States,* 157 Ct. Cl. 548, 302 F.2d 934 (1962); see also *Inc. Trustees of Gospel Wkr. Soc. v. United States,* 510 F. Supp. at 379; *Christian Manner International v. Commissioner,* 71 T.C. at 670; *Scripture Press Foundation v. United States,* 285 F.2d at 806 n. 11; cf. *Pulpit Resource v. Commissioner,* 70 T.C. at 611 (upholding exemption where there was no evidence of commercial competition). This factor, we think, weighs against petitioner. We find unconvincing its assertions that it did not compete with other publishing houses. There is no evidence that petitioner was the exclusive vender of the books it sold. While Bryce testified that he knew of no other American publishing house dedicated to reformed Presbyterian literature, we note that at least one other company, Baker Book Stores, sold books to petitioner and that petitioner sold books to other publishing houses as well. There must have been overlap in subject matter for this to have occurred. In 1975, petitioner offered for sale over 250 titles of some 100 authors, a fact indicating that a market of some size existed in which other publishers shared. Moreover, while petitioner upon occasion published books rejected by other publishing houses, it published some works that sold well, thus possibly diminishing other publishing houses' sales (if the public preferred, for example, a Jay Adams book) and, of course,

preventing other companies from reaping the benefit of proven sellers.

Other activities as well indicate that petitioner was animated by a substantial commercial purpose. It consciously attempted to transform itself into a more mainline commercial enterprise: It searched out more readers; it employed paid workers; it dropped money-losing plans; it paid substantial royalties; it made formal contracts with some authors; and, of course, it expanded into a new facility from which it could continue to reap profits. Further, petitioner was not affiliated or controlled by any particular church organization and this nondenominational character "contributes to the resemblance between its publishing activities and those of commercial, nonexempt publishers of Christian literature with whom * * * [it] competes." *Inc. Trustees of Gospel Wkr. Soc. v. United States, supra* at 379 n. 16.

Petitioner argues that it accumulated profits to expand so that it could publish more books and thus reach more readers. We recognize that petitioner used a large amount of its accumulated profits for the new Harmony facility; this new facility probably aided petitioner in increasing its productivity and distribution. Such increase, however, may also be indicative of a commercial enterprise. We are not convinced that one of the significant reasons for expansion was not the commercial one of wishing to expand production for profit. Cf. *Inc. Trustees of Gospel Wkr. Soc. v. United States, supra* at 379.

There are factors weighing in petitioner's favor, indicating a nonprofit-oriented approach. In the past, petitioner relied largely on volunteers and, when it did hire workers, it paid them modest amounts; it published some books espousing its chosen doctrine even if they would not sell well; it made interest-free loans to Harmony Press; it donated books and, in 1978 and 1979, rather sizable amounts of money to organizations involved in disseminating reformed Presbyterian doctrine. We believe, moreover, that those involved in petitioner's activities are sincerely dedicated to their religious mission. Yet, in view of petitioner's avowed assumption of more aggressive commercial practices, its policy of pricing to break even on some sales while making a profit on all others; its considerable profit margins, its great growth in profits, its physical expansion, and its practice and competition in a

commercial field, we conclude that petitioner's substantial, and indeed, primary purpose was the nonexempt one of selling religious literature at a profit.

Cases where a tax-exempt organization conducts only one activity present particular difficulty. We recognize that petitioner's potential success in fulfilling, its exempt purpose of disseminating reformed doctrine increased as its publication of books expanded. We also reject the notion, perhaps implicit in some of respondent's arguments, that efficiency and success automatically negate tax-exempt status. But where an organization successfully engages in commerce, it must prove that it did so with the conscious and dominant purpose of furthering its exempt end, with commercial success an incidental byproduct. In adopting a commercial method of operation, an organization runs the risk that the commercial methods will reflect a commercial purpose and that this commercial purpose will, over time, become substantial and even "swallow up" the exempt purpose. See and compare *Elisian Guild, Inc. v. United States,* 412 F.2d 121, 125 (1st Cir. 1969). Such a gradual growth and eventual engulfing occurred in the present case; petitioner's commercial purpose assumed such significance that we cannot conclude that it was merely incidental to its religious mission. See *Christian Manner International v. Commissioner,* 71 T.C. at 666.

Petitioner's second argument is that respondent abused his discretion in making the revocation retroactive. Respondent answers that it is his "position that by 1969, and most certainly by 1975, petitioner's activities were materially different than the 1939 activities upon which the favorable ruling was made."

Section 7805(b) provides that the Secretary "may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." Explaining this section in *Automobile Club v. Commissioner,* 353 U.S. 180, 184 (1957), the Supreme Court stated:

it is clear from the language of the section and its legislative history that Congress thereby confirmed the authority of the Commissioner to correct any ruling, regulation or Treasury Decision retroactively, but empowered him, in his discretion, to limit retroactive application to the extent necessary to avoid inequitable results. [Fn. ref. omitted.]

Consistent with this teaching of the Supreme Court, the Secretary has limited his discretion to give retroactive application to his rulings respecting organizations once ruled to be exempt by section 601.201(n)(6)(i), Statement of Procedural Rules, which is as follows:

*Revocation or modification of rulings or determination letters on exemption and foundation status.* (i) An exemption ruling or determination letter may be revoked or modified by a ruling or determination letter addressed to the organization, or by a revenue ruling or other statement published in the Internal Revenue Bulletin. The revocation or modification may be retroactive if the organization omitted or misstated a material fact, operated in a manner materially different from that originally represented * * * . In any event, revocation or modification will ordinarily take effect no later than the time at which the organization received written notice that its exemption ruling or determination letter might be revoked or modified.[19]

For the reasons stated above, we think that petitioner has been "operated in a manner materially different from that originally represented" within the meaning of this Statement of Procedural Rules and, thus, its exemption may be revoked retroactively. As detailed in our findings, when the exemption ruling was issued in 1939, petitioner's "actual activities consist[ed] of publishing a religious paper known as 'Christianity Today,' a Presbyterian journal devoted to stating, defending, and furthering the gospel"; its income was derived from subscriptions, contributions, and gifts. Yet the ruling recognizes that petitioner was incorporated "to carry on a printing and publishing business." Publishing books and other literature for the purpose of "furthering the gospel" in certain circumstances may not be materially dfferent from publishing a "religious paper." At some point, however, the operation of petitioner's book sales activity became so substantial and so

---

[19]Sec. 601.201(1)(5), Statement of Procedural Rules, contains a more general statement of the policy on retroactive revocations of all types of rulings as follows:

"Except in rare or unusual circumstances, the revocation or modification of a ruling will not be applied retroactively with respect to the taxpayer to whom the ruling was originally issued or to a taxpayer whose tax liability was directly involved in such ruling if (i) there has been no misstatement or omission of material facts, (ii) the facts subsequently developed are not materially different from the facts on which the ruling was based, (iii) there has been no change in the applicable law, (iv) the ruling was originally issued with respect to a prospective or proposed transaction, and (v) the taxpayer directly involved in the ruling acted in good faith in reliance upon the ruling and the retroactive revocation would be to his detriment. * * * Where a ruling to a taxpayer is revoked with retroactive effect, the notice to such taxpayer will, except in fraud cases, set forth the grounds upon which the revocation is being made and the reasons why the revocation is being applied retroactively."

commercial in nature as to constitute a purpose in and of itself which deprived petitioner of its right to exemption. This change in purpose and mode of operation clearly constitutes a material change.

The date to which this revocation should be made retroactive is, however, less certain. The Commissioner has elaborated on his discretionary standards regarding the timing of retroactive revocation in Rev. Proc. 80–25, 1980–1 C.B. 667, 671 (effective June 30, 1980), which reads in part as follows:

> A ruling or determination letter recognizing exemption may be revoked or modified by a subsequent ruling or determination letter addressed to the organization, or by a revenue ruling or other statement published in the Internal Revenue Bulletin. The revocation or modification may be retroactive if the organization omitted or misstated a material fact, operated in a manner materially different from that originally represented * * * . *Where there is a material change, inconsistent with exemption,* in the character, the purpose, or the method of operation of an organization, *revocation or modification will ordinarily take effect as of the date of such material change.* In cases where a ruling or determination letter was issued in error or is no longer in accord with the holding of the Service, retroactivity of the revocation or modification ordinarily will be limited to a date not earlier than that on which the original ruling or determination letter is modified or revoked. [Emphasis added.]

Respondent argues that by 1969, petitioner's operations had changed so materially as to be inconsistent with exemption.

It is difficult to pinpoint the year in which the disqualifying change occurred because of its gradual nature, and we are aware that a retroactive revocation will not be disturbed in the absence of an abuse of discretion. *Automobile Club v. Commissioner, supra* at 184. Where, however, the Commissoner has chosen, in the exercise of his wide discretion, to impose discretionary limits, he must abide by those limits. See *Lansons, Inc. v. Commissioner,* 622 F.2d 774, 778 (5th Cir. 1980), affg. 69 T.C. 773 (1978); cf. *Pittsburgh Press Club v. United States,* 615 F.2d 600, 606 (3d Cir. 1980). In his Rev. Proc. 80–25, the Commissioner has limited the sweep of retroactivity in cases involving a material change to the date of such change. We do not think that such a material change occurred in 1969, and hold that respondent abused his discretion in making the revocation effective in 1969.

In 1969, the religious book sales activities were run out of Charles' home; were just beginning to involve the use of the

truck garage purchased by Charles personally; were manned by volunteers; and, even so, produced only a 3-percent net profit margin. Moreover, petitioner received contributions ($11,785) nearly four times as great as its net profits ($3,105) from the sale of religious books. To agree that these facts constitute "material changes, inconsistent with exemption" would, we think, imply that small profits on sales of goods alone warrant revocation of exempt status, a position we have heretofore rejected. *Pulpit Resource v. Commissioner,* 70 T.C 594 (1978); *Saint Germain Foundation v. Commissioner,* 26 T.C. 648 (1956).

By 1975, the alternative year suggested by respondent on brief, however, the facts had changed materially. By then, petitioner had assumed the attributes of a commercial enterprise—its profits were large ($106,180); its net profit margin stood at 26 percent; it paid royalties of $37,020 (as opposed to $350 in 1969); it offered more than 250 book titles for sale; and it spent $28,976 for resale books. Petitioner's cash-on-hand increased by nearly $114,000 in 1975 alone (only $14,890, including contributions, in 1969). Moreover, it was planning for the acquisition and construction of a new plant. Its operations had acquired a truly commercial hue.

The important facts inconsistent with exemption with respect to petitioner's operations—gross sales, cost of goods sold, contributions received and made, disbursements, and accumulations of funds (and the purposes thereof)—were reported to the IRS on Forms 990 beginning with 1969, but the IRS did not select any of those forms for examination prior to the one filed for 1975. Although petitioner was not formally advised of the selection until June 21, 1976, petitioner's letters to the IRS show that it was aware by 1975 that IRS agents had been raising serious questions regarding petitioner's exemption status.[20] We conclude that making the revocation effective as of January 1, 1975, is not an abuse of discretion. *Automobile Club v. Commissioner, supra* at 184; *Christian Echoes National Ministry, Inc. v. United Stated,* 470 F.2d 849, 858 (10th Cir.

---

[20]Bryce testified that petitioner has built and maintains a cash reserve of between $180,000 and $200,000 to cover any taxes that may be determined to be due. Compare *Lesavoy Foundation v. Commissioner,* 238 F.2d 589, 594 (3d Cir. 1956), revg. 25 T.C. 924 (1956).

1972); *Wisconsin Nipple & Fabricating Corp. v. Commissioner,* 67 T.C. 490, 496 (1976), affd. 581 F.2d 1235 (7th Cir. 1978); *Lowry Hospital Assn. v. Commissioner,* 66 T.C. 850, 860, (1976).

*An appropriate decision will be entered.*