THE ECCLESIASTICAL ORDER OF THE ISM OF AM, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10769–81X.     Filed May 2, 1983.

*Joseph Falcone*, for the petitioner.
*Alan C. Levine*, for the respondent.

OPINION

TANNENWALD, *Chief Judge*: This is an action for declaratory judgment pursuant to section 7428.[1] Petitioner filed an application for recognition of exemption from Federal income tax on January 15, 1980, seeking exemption under section 501(c)(3) and claiming to be a church within the meaning of sections 509(a)(1) and 170(b)(1)(A)(i). After a lengthy adminis-

---

[5]But cf. sec. 704(b) as amended by sec. 213(d), Tax Reform Act of 1976, 90 Stat. 1520, 1548.

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure.

trative review, respondent, on February 18, 1981, issued an adverse ruling which stated in part that—

You are not operated exclusively for religious or any exempt purpose described in section 501(c)(3) of the Code. You are not operated in such a manner that no part of your net earnings will inure to the benefit of any individual. In addition, you are operated for private rather than public interests. We have also determined that if you were described in section 501(c)(3), you would be a private foundation because you are not a church within the meaning of section 170(b)(1)(A)(i), the only basis upon which you claim non-private foundation status.

Petitioner then timely filed its petition herein.

This case was submitted fully stipulated pursuant to Rule 122. The administrative record filed by respondent is incorporated herein by this reference. See Rule 217.

Petitioner was incorporated in Michigan in 1978. Its officers are Rev. George N. Baustert, president, Cardinal Chalmers O. Smith, vice president, and Janette C. Schwedt, secretary-treasurer.[2]

Petitioner is composed of a home office and approximately 26 chartered orders. At times, petitioner contends that each order is a separate entity; at other times, petitioner appears to suggest that all orders are part of a single entity. It is clear, however, that only the home office is a party to the present action.[3]

Petitioner conducts an active campaign for followers. Originally, petitioner sought converts through a pamphlet entitled "The Proof of Am," which explains the Ism of Am's deistic beliefs.[4] No one converted, however, because, as petitioner candidly admits, "Something was missing!" After studying materials developed by the Universal Life Church, Rev. Baustert wrote new literature and instituted several refinements in petitioner's method of operations. These changes greatly enhanced petitioner's recruitment effort.

The new recruiting approach developed by petitioner emphasizes to a great extent the tax benefits of becoming a

---

[2]Petitioner's officers are apparently unrelated. However, Rev. Baustert and Ms. Schwedt live together and Ms. Schwedt was described by petitioner, in correspondence with respondent, as Rev. Baustert's "companion and confidant."

[3]By letter dated July 15, 1980, petitioner expressly declined to apply for a group ruling.

[4]For purposes of this opinion, we accept, as true, petitioner's contention that its deistic beliefs are, in fact, held. Similarly, we accept as true the petitioner's descriptions of its "religious" activities.

minister in the Ism of Am. This emphasis is illustrated in the "education" given to new ministers, in the materials distributed by petitioner to potential converts, and in the training given to petitioner's "membership counselors."

Degrees and/or titles are awarded by petitioner to ministers upon completion of each of four stages of the "Phases of Awareness." Although certain pamphlets are provided with each "phase," no check is provided to assure that each minister studies and understands them. However, some of these pamphlets are, no doubt, studied very carefully, for, as petitioner observes, completion of the "Phases of Awareness" assures that "you will be an expert in the administration and *benefits* of a Chartered Order of ISM of AM." (Emphasis added.)

Petitioner's "Awareness" program is structured as follows:[5] For a "donation" of $25 (Phase I), one is ordained as a Minister in the Ism of Am. Each new minister receives instructions entitled "Ecclesiastical Orders of Law I" and a copy of "The Book of Am—The Enlightenment."[6] For a "donation" of $75 (Phase II) one receives a Doctorate of Divinity degree and a "Legal Charter * * * complete with federal and state exempt numbers." Instructions provided include "Ecclesiastical Orders of Administration I" and "Untaxables I." For a "donation" of $50 (Phase III), one is bestowed with a Certificate of Bishop and instructions entitled "Untaxables II." Finally, for a "donation" of $50 (Phase IV) one is canonized to Cardinal. Instructions received include "Untaxables III" and "Share with Am."

The "instructions" that accompany each phase discuss, in great detail, the tax benefits of being a minister in the Ism of Am. Nothing would be gained by describing these documents in detail; a few examples reveal their tenor. Untaxables I begins with the self-serving caveat that "The Ism of Am is not a tax reform movement, and it is important to note that it is

---

[5]The "Phases of Awareness" are discussed in detail in petitioner's recruiting brochure entitled "The Existence of Am."

[6]Each new minister also receives an 8-inch by 10-inch Credentials of Ministry Certificate "ready for framing," a "personal signant of the ISM OF AM key ring (suitable for converting to a neckless)" (sic), and instructions for performing civil wedding ceremonies.

not our intention to teach you how to evade taxes." The pamphlet then provides, inter alia, a laundry list of personal expenses incurred by the minister that the order can pay as part of the minister's housing allowance. Lest anyone be concerned about the propriety of such actions, the pamphlet goes on to state that—

*It may seem that, if one starts a Chartered Order, donates money, and then uses the money to benefit the officers of the Order, this action might be considered "Self Dealing".* Had you decided to form your own church wherein you would be responsible for control of the entire church, the problem of "Self Dealing" might be very real. However, since your Chartered Order is as much an Order of the ISM of AM as the Home Office, *you need not be concerned about self dealing.* All ministers of the ISM of AM are members of and make contributions to The Ecclesiastical Order of the ISM of AM, Inc. *What the Order does with these contributions is of no concern to others outside of the Order. Not all donations donated to the Catholic Church are required to be sent to the Pope.* [Emphasis added.]

Untaxables II further "educates" one in the "benefits" of being a minister in the Ism of Am. In an illuminating passage, Untaxables II states that—

Being a Minister of AM, you are entitled to be reimbursed for using your personal auto for Order related business. However, you will be required to keep daily records of this useage since, unlike the Minister's housing allowance, all money received by the Minister as an auto allowance is considered TAXABLE income to the Minister. The Minister is allowed to deduct 17¢ per mile for the first 15,000 miles, and 10¢ per mile for all mileage over 15,000, for all mileage driven on church related business.

Most Ministers prefer to have their Order own the auto, and be authorized as the Minister of the Order, to exclusive use of the vehicle. This way the Order is responsible to pay all associated operational costs, including gas, oil, insurance, license and registration fees, as well as maintenance and repairs. This is possible only if the vehicle is used primarily in Order work. *Since you as the Minister are always seeking new members to "Share With AM" every where you go, the auto is indeed being used for the benefit of your Chartered Order, and the free use of the auto IS NOT considered taxable income to the Minister.* [Reproduced literally; emphasis added.]

In another illuminating passage, Untaxables II states that—

### THE FAMILY OF AM

Being a Minister of AM, you are now privileged to have your Chartered Order provide you, as the minister, with a home, food, clothing, insurance, travel expenses, etc. However, under the law, your order is not authorized to provide your wife and/or children with their worldly needs. *Of course your wife and children, 18 years or older, are privileged to become Ministers of AM*

in their own right *and enjoy the benefits guaranteed by law to a Minister of a Chartered Order*, nonetheless, your children and/or congregational members that are younger than 18 years are not eligible for tax exempt compensations from your order. But, by the law, your Order is authorized to pay for any maintenance, improvements or repair to your home, as provided by your Order, and may very well hire your children for such services without regard as to the amount of payment. As long as none of these children receive more than $2,600 per annum, they are not required to even file income tax returns. They can use these earnings to provide for themselves the necessities and pleasures that you as the Minister are not authorized to provide them with on a direct basis, using your Chartered Orders' assets. [Reproduced literally; emphasis added.]

Untaxables III advises that *"there is a way * * * to significantly reduce the amount of withholding taxes taken from [your] paychecks. Ministry in the* ISM *of* AM *is the answer."* (Emphasis added.) Orders of Law I claims that "The wealthy families in this country have taken advantage of the tax laws of this country for more than two centuries. *It is for this reason that we do not have to explain or defend our actions regarding the avoidance of taxes."* (Emphasis added.) Orders of Administration I states that Each Chartered Order is granted the PRIVILEGE of using the Federal and State identification numbers and the TAX EXEMPT status of the Home Office. This relieves the Charter Order of the responsibility of dealing with the IRS."[7] The pamphlet also contains the jingle *"Run your business with businesslike finesse, and you'll never be the business of the IRS."* (Emphasis in original.) Similarly, the pamphlet "The Rational Religion of Rational Humankind," which is distributed to potential converts to "set[ ] the *attitude for acceptance* of the I AM U + U AM I vow" (emphasis added), states, "we would be remiss in our duties if we did not provide for our ministers and members to participate in the FREE RIDE being given to the Pope, Billy Graham, Ms. Carter, ad infinitum."

The "training" given to a membership counselor consists of instructing the minister to review the materials provided in

---

[7]Similarly, petitioner's "charter agreements," which are presented to each new order in Phase II, provide that "the order is privileged to maintain a nonprofit status utilizing the corporate numbers of the Home Office. State No. 707–598. IRS Number 38–2257252." However, the "IRS number" referred to is not, as petitioner seems to imply, a "tax-exempt" number (see p. 835 *supra*); it is merely an employer identification number.

the four "Phases of Awareness"[8] and having him or her *take* a "licensing examination" which is "graded" at the home office and then returned to the "licensed" counselor for reference purposes.[9] Of the 42 true/false and 8 multiple choice questions asked before a minister can become a membership counselor, virtually all deal with some aspect of tax law or administration procedure. For example, question 15 "asks": "The maximum deduction in any one year, a person can take on their income taxes is 50% of adjusted gross income," and question 45 "asks": "The best financial benefits will accrue to the minister who: (A) Receives a normal salary and use of an Order-owned vehicle[;] (B) Receives a rental allowance and an auto allowance[;] (C) Receives a rent-free living quarter and uses an Order-owned vehicle[;] (D) Receives a housing allowance and an auto allowance[.]" Several questions seek to reinforce, in the minds of the prospective membership counselors, the "legality" of petitioner's tax benefits. For example, question 19 "asks": "Federal government has the right by law to determine if a particular Order is legal or not," and question 31 "asks": "The ism of am will defend its chartered congregations against an attack by the IRS."

To qualify for exemption under section 501(c)(3), petitioner must show (1) that it is organized and operated exclusively for religious or charitable purposes, (2) that no part of its earnings inures to the benefit of a private individual or shareholder, and (3) that no substantial part of its activities consists of the dissemination of propaganda or otherwise attempting to influence legislation or engaging in political activity. Sec. 1.501(c)(3)–1, Income Tax Regs.

Respondent contends that petitioner is not exempt because (1) it is operated for the substantial nonexempt purpose of encouraging the avoidance of payment of Federal income

---

[8]Therefore, only cardinals, who have "donated" $200 to petitioner, are eligible to become membership counselors.

[9]Petitioner provides the minister with a strong financial incentive, in addition to any nonpecuniary gratification he or she might receive, to recruit new members. As "The Existence of Am" pamphlet explains, a membership counselor "earn[s] a tax free income for [his or her] Order of $100.00 for each new member" he or she brings in.

taxes, (2) its net earnings inure to the benefit of its members, and (3) it serves private, rather than public, interests.[10]

Section 501(c)(3)'s operational test requires that an organization's activities primarily serve one or more exempt purposes and not, except to an insubstantial degree, a nonexempt purpose. Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. The existence of a "single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes." *Better Business Bureau v. United States,* 326 U.S. 279, 283 (1945). See also *Presbyterian & Reformed Publishing Co. v. Commissioner,* 79 T.C. 1070 (1982); *Copyright Clearance Center v. Commissioner,* 79 T.C. 793 (1982); *Basic Bible Church v. Commissioner,* 74 T.C. 846 (1980); *First Libertarian Church v. Commissioner,* 74 T.C. 396 (1980).

We find that petitioner is not operated exclusively for exempt purposes under section 501(c)(3). Petitioner's substantial nonexempt purpose consists of counseling individuals, for specific "donations," on the purported tax benefits available to ministers of the Ism of Am under the Internal Revenue Code. This counseling is clearly not religious, nor does it qualify as "educational" within the context of section 501(c)(3). Even if one assumes that the tax information disseminated by petitioner is not misleading or distorted (an assumption that is at least dubious),[11] the information is no different from that furnished by a commercial tax service, albeit within a narrower field (i.e., tax benefits to ministers and churches) and a narrower class of customers (i.e, petitioner's ministers). Consequently, petitioner serves private, rather than public, purposes. See *Christian Stewardship Assistance v. Commissioner,* 70 T.C. 1037, 1041 (1978). Moreover, petitioner's premise that a religious organization's disbursements to its ministers, regardless of amount, cannot be successfully challenged by respondent has been repeatedly rejected. See *Church of the Transfig-*

---

[10]Respondent also argues that even if we are to find that petitioner is tax exempt under sec. 501(c)(3), petitioner is not excepted from foundation status under sec. 509(a)(1) because petitioner has failed to show that it is a church within the meaning of sec. 170(b)(1)(A)(i).

[11]Petitioner repeatedly seeks to convince potential converts that the organization is tax exempt (see n. 7 *supra*) and the ministers in the Ism of Am will, in fact, receive the suggested tax benefits. See pp. 835–837 *supra*.

*uring Spirit v. Commissioner,* 76 T.C. 1 (1981); *Southern Church of Brotherhood Assembled v. Commissioner,* 74 T.C. 1223 (1980).[12] The tax information and advice so permeates petitioner's literature[13] that we cannot help but conclude that although petitioner may well advocate belief in the God of Am, it also advocates belief in the God of Tax Avoidance. We conclude the petitioner's activities constitute a substantial nonexempt purpose.

On brief, petitioner discusses its religious activities at great length and contends that it "is primarily engaged in the furtherance of what some may call its unorthodox religious beliefs, which, despite the opinion of the Respondent, fall within the 'protections of the * * * First Amendment,'" citing *The Church in Boston v. Commissioner,* 71 T.C. 102 (1978). For purposes of this opinion, we have accepted as true petitioner's description of its activities and its contention that its "unorthodox religious beliefs" are, in fact, held. See note 4 *supra.* Contrary to petitioner's contentions, however, such a finding does not require us to conclude that petitioner is tax exempt because, as we have already noted, the existence of a single substantial nonexempt purpose destroys exempt status. See pp. 839–840 *supra,* and cases cited thereat.

Petitioner presents three arguments why its emphasis on tax advantages and administrative details does not violate the operational test of section 501(c)(3). First, petitioner contends that it would be remiss if it did not share this tax information with its members. We disagree. There is a big difference between *informing* members that ministers may be entitled to special tax benefits, *as an incident* to carrying on primarily

---

[12]Sec. 501(c)(3) specifically requires that "no part" of the organization's net earnings "inure[] to the benefit of any private shareholder or individual." The inurement requirement has been construed to incorporate a "reasonableness" standard. See *People of God Community v. Commissioner,* 75 T.C. 127 (1980); *Saint Germain Foundation v. Commissioner,* 26 T.C. 648 (1956). Petitioner's "instructions" focus on maximum tax benefits; no consideration is given to the "reasonableness" limitation.

[13]We recognize that some of petitioner's literature is relatively devoid of the tax avoidance message. For example, both "The Book of Am—The Englightenment" and the pamphlet "The Proof of AM" mention taxes only once, in a sentence which states that, "Moreover, beyond the possession of such power over others, the church is materially the richest corporation in the world and for the most part pays no taxes." However, the rest of petitioner's literature contains so many suggestions and recommendations regarding maximizing tax benefits that one cannot but conclude that a substantial nonexempt purpose permeates the literature taken as a whole.

religious activities, and *suggesting innumerable* methods by which ministers can *maximize* tax benefits, which is carried on as *a substantial activity* in and of itself. Petitioner's activity in this regard is so pervasive that it goes far beyond any bona fide religious purpose.

Second, petitioner contends that respondent has placed it in a "damned if you do, damned if you don't" position and, therefore, that its discussion of tax benefits does, in fact, promote a religious purpose. Specifically, petitioner contends that if its members were not instructed in the details of administering their orders, respondent could deny tax-exempt status to the individual orders for failure to comply with regulations concerning proper administration of tax-exempt organizations. This argument misconstrues respondent's position. Petitioner is not "damned" because it explains simple recordkeeping procedures to its members; petitioner is "damned" because its detailed discussions of ways to maximize tax benefits are so pervasive that they constitute a substantial nonexempt purpose.

Third, petitioner contends that its discussions of tax benefits are necessary to attract new members, which is, petitioner claims, the major objective at this stage of the young organization's life. However, a substantial nonexempt purpose does not become an exempt purpose simply because it promotes the organization in some way. See *First Libertarian Chruch v. Commissioner, supra.*

Petitioner also makes the general argument that its discussion of taxes cannot be considered "tax avoidance" unless petitioner is a sham. We disagree. There is nothing inconsistent between saying that a religious organization is, in fact, bona fide and denying that organization tax-exempt status because it carries on a substantial nonexempt activity. See, e.g., *Bethel Conservative Mennonite Church v. Commissioner*, 80 T.C. 352 (1983).

Finally, petitioner argues that denial of its tax-exempt status request would violate the establishment and free exercise clauses of the First Amendment and its equal protection rights under the due process clause of the Fifth Amendment. It is well settled, however, that—

the Government may constitutionally tax the income of religious organizations * * * [and] may decide not to exercise this power and grant reasonable

exemptions to qualifying organizations while continuing to tax those who fail to meet these qualifications. *Parker v. Commissioner*, 365 F.2d 792, 795 (8th Cir. 1966), affg. sub nom. *Foundation for Divine Meditation, Inc. v. Commissioner*, T.C. Memo. 1965–77. * * *

*Gen. Conf. of the Free Church v. Commissioner*, 71 T.C. 920, 930–931 (1979). Tax exemption is a matter of legislative grace and not of constitutional right. See *Unitary Mission Church v. Commissioner*, 74 T.C. 507 (1980), affd. without opinion 647 F.2d 163 (2d Cir. 1981). Nevertheless, unconstitutional discrimination might well arise if benefits granted to one religious group are denied to others of essentially the same class. See *Golden Rule Church Association v. Commissioner*, 41 T.C. 719 (1964).

Petitioner's constitutional arguments are based on the assumption that respondent has singled it out for attack because of its "non-traditional" or "unorthodox" beliefs. We find, however, that respondent denied petitioner's application for tax-exempt status, not because of petitioner's beliefs, but because of petitioner's substantial nonexempt purpose.[14] Petitioner has not suggested that there exists, and, we submit, cannot find, a single instance in which respondent has granted tax-exempt status to a religious organization that carried on activities similar to petitioner's. Consequently, on the record before us, respondent's denial of petitioner's application for tax-exempt status is far from being constitutionally infirm. See *Christian Echoes National Ministry v. United States*, 470 F.2d 849 (10th Cir. 1972); *Gen. Conf. of the Free Church v. Commissioner, supra.*

In the interest of justice, we feel compelled to reiterate the limited nature of our holding. We are not holding today that any group which discusses the tax consequences of donations to and/or expenditures of its organizations is in danger of losing or not acquiring tax-exempt status. Our holding today goes only to those organizations whose entire existence is permeated with the purpose of counseling taxpayers on tax matters.

---

[14]We are aware that respondent also "questions" whether petitioner's beliefs are sincerely held. Given the pervasive nature of petitioner's tax-avoidance discussions, it is not surprising that respondent would take such a position. However, we are convinced that, given the nature of petitioner's activities, this disbelief was not the reason petitioner's request was denied.

In sum, petitioner is, as we have previously pointed out (see pp. 839–840 *supra*), nothing more than a commercial tax service, albeit in a narrow range of matters of interest to its members, operating under the cover of a professed religious purpose (which we have accepted as true for the purposes of this case). That religious belief may be the body of the automobile but its engine and the gasoline on which it runs consist of tax information and advice as to methods of tax avoidance, if not downright tax evasion. There is simply no escape from the conclusion that petitioner is operated for a substantial nonexempt purpose. Accordingly,

*Decision will be entered for the respondent.*