CHURCH OF WORLD PEACE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Church of World Peace v. Commissioner
Docket No. 27306-90X
United States Tax Court
T.C. Memo 1994-87; 1994 Tax Ct. Memo LEXIS 88; 67 T.C.M. (CCH) 2282; February 28, 1994, Filed *88 For petitioner: William T. Conklin, an officer. For respondent: Virginia L. Hamilton and Sara J. Barkley. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: The Commissioner revoked petitioner's exemption from Federal income taxation under section 501(a)[1] as an organization described in section 501(c)(3). Pursuant to section 7428, petitioner seeks a declaratory judgment of this Court that it is an "exempt church" described in section 501(c)(3). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits, including the administrative record, are incorporated *89 herein by reference. Petitioner was incorporated in 1977 as a nonprofit corporation under the laws of the State of Colorado. Petitioner was located in Denver, Colorado, when the petition was filed. During 1978, petitioner applied for and was granted tax-exempt status under section 501(c)(3). William Conklin signed petitioner's Form 1023, Application for Recognition of Exemption, which named him as the contact person for petitioner, as petitioner's "Arch-Bishop" and "Secretary", and as a member of its board of directors. [3]
An advertisement in the classified section of the Denver Downtowner dated August 20, 1980, which was contemporaneously placed by Internal Revenue Service personnel in its administrative file relating to petitioner, [4] states as follows: BECOME A *90 LEGALLY ORDAINED MINISTER. Receive beautiful certificate. $ 10.00 donation. Church of World Peace, PO Box 12514, Denver, CO 80212 or call Rev. Conklin 433-0224.
In response to correspondence from the Internal Revenue Service, a letter dated November 7, 1980, on behalf of petitioner advised that petitioner's ministers "are trained by the school of life", and the church does not "operate any sort of school or auxiliary." In a letter dated January 6, 1981, the Internal Revenue Service advised petitioner that it planned to conduct an examination of petitioner under sections 7602 and 7605(c). On April 4, 1984, the Internal Revenue Service served a summons on William Conklin requesting certain books, records, and papers of petitioner. Subsequently, the Internal Revenue Service served summonses on certain third party *91 recordkeepers for certain records and correspondence relating to accounts in petitioner's name. The history of the summons enforcement action and appeals are set forth in Church of World Peace, Inc. v. Commissioner, T.C. Memo. 1992-318, pursuant to which this Court denied motions by petitioner to suppress evidence in the administrative record obtained as a result of the summons.[5]
Pursuant to the April 4, 1984, summons, Mr. Conklin provided the Internal Revenue Service with a document entitled "STARTING PROCEDURES AND HOMEWORK ASSIGNMENT" (the Starting Procedures), which state in part as follows: 1. Important Data about our Church
Our employer identification number is 84-0748083. This number must be used on all bank accounts to *92 register the correct organizational identity. * * * Starting procedures: * * * 3. Fill out our congregation application and information sheet. The congregation agreement must be signed by all members of the congregational board. 4. Get the board members together to have the first board meeting. The basic procedures of the congregation should be established. The pastor should be hired and a housing allowance should be approved. This allowance is specifically excludable from gross income for the minister, other compensation is income and must be declared on the 1040. Also approve expense allowance procedures, medical reimbursement plan, etc. 5. Your congregation must file quarterly reports and an annual report, be sure you understand these procedures. The annual report must include a list of all contributors to the congregation for the year. 6. Obtain bank cards and bring them to the Central Office for the appropriate signatures and seals. * * * 9. Be sure to understand all the methods and means of reimbursement, board approvals, etc. Make sure all checks are coded as to what they are for. Any money received by anyone that is not a designated housing allowance *93 or an approved reimbursement is considered taxable income. 10. We suggest that you have two to four signers on the Church account. It is a good idea if the pastor is not allowed to sign. The treasurer (who is not in the pastor's family) should sign the checks if at all possible. * * * III. CHURCH CHECKING ACCOUNT AND DONATIONS * * * Your account should be in the name of the Church of World Peace, Inc. as shown below. The "Inc." is recommended on your checks. Headquarters will have to stamp your signature card. You should start up the account so that at least two people may write checks on it -- the pastor and the treasurer, for example. Having check writing ability up to $ 500.00 without prior board approval is also recommended. * * * * * * Never accept donation checks made out to anyone but the Church of World Peace, Inc. and always try to have them include the "Inc."
The Starting Procedures provided advice about the importance of accurate recordkeeping for tax purposes, the type of expenses and substantiation for "a tax free, non-reportable housing allowance" for the pastor, and how to claim exemption from Social Security taxes on a pastor's housing *94 allowance. At a December 22, 1977, meeting of petitioner's board of directors, Mr. Conklin was named "Bishop" and granted authority to issue charters to begin branches of petitioner. By 1978, petitioner began entering into church charter agreements. During 1978 through 1982, the church charter agreements required each parish to provide petitioner with a quarterly activity and financial report. During 1983, petitioner began entering into congregation agreements, which required similar quarterly reports. "Offerings" were to be sent with each quarterly report, ranging from $ 5 in 1978 to $ 90 in 1983. In 1983, the "requested donation" for entering into a church charter agreement was $ 900. Minutes of the February 21, 1983, meeting of petitioner's board of directors state regarding the quarterly reports: "Any congregation that is not current on quarterly reports will have their funds cut off by the corporate board of directors. This is very important to allow the corporation to maintain control of the funds of each congregation." At a June 25, 1983, meeting, petitioner's board of directors stated: "The accounting office will send the bulk of funds to congregations that are recruiting *95 the most money for the church." Some of petitioner's advertisements were included in the "Bookkeeping-Tax Services" classification. Various letters to petitioner and advertisements for courses at Denver Free University suggest that there were no requirements to become one of petitioner's ministers, [6] other than paper work and a "requested donation". Petitioner's newsletters for 1979 through 1983, of which Mr. Conklin was editor, are replete with tax advice and information. For example, four paragraphs (over half) of the June 1981 newsletter is tax information relating to a case of the Universal Life Church and to an Internal Revenue Service letter ruling regarding a pastor's housing allowance. Petitioner's January 1980 newsletter states that Mr. Conklin may be consulted about spiritual or financial matters in relation to running a parish [7] for a "requested *96 $ 20.00/hr. donation". The May 1982 newsletter indicates that petitioner held a "Clergy Conference" on May 6, 1982, at which the topic was: "IRS Techniques in auditing Charitable contributions to non-traditional churches." Mr. Conklin taught the class "Starting Your Church" at Denver Free University. Church charter agreements and "Church Charter Information Sheets" in the record indicate that Mr. Conklin was one of the three members of the board of directors and/or an officer of at least seven of petitioner's parishes, and there were at least 11 parishes in which E. Christopher Mohr held such a position. Pursuant to the third-party summonses, the Internal Revenue Service obtained bank records from Western Federal Savings and Loan Association of Colorado (Western Federal Savings) relating to petitioner and from other institutions relating to accounts of 45 parishes. At trial, the records relating to petitioner, Mr. Conklin, and parishes *97 known as "Church of World Peace, Inc. No. 10" (CWP No. 10), "Church of World Peace, Inc. No. 33" (CWP No. 33), "Church of World Peace, Inc. No. 41" (CWP No. 41), and "Church of World Peace, Inc. No. 80" (CWP No. 80) [8] were admitted as evidence. Alfred K. Carr was the pastor of CWP No. 10. Rodger Lang was president, and Kara Lang, his wife, was vice president and secretary of CWP No. 33. James P. Clark [9] was president of CWP No. 41. Mr. Mohr was president *98 of CWP No. 80. Federal income tax returns for some of these individuals and summaries of the underlying bank records prepared pursuant to rule 1006 of the Federal Rules of Evidence were also admitted at trial. *99 The records of all 45 of the parishes reflect banking transactions similar to the following involving CWP No. 10: (1) A check dated July 21, 1983, in the amount of $ 1,000, payable to petitioner, and designated as a donation, was drawn on Mr. Carr's individual account with Columbia Savings and signed with his name; (2) a check dated July 22, 1983, in the amount of $ 1,000, with the notation "cwp-10", signed with Mr. Carr's name, designated as Archbishop, was drawn on petitioner's account with Western Federal Savings, [10] and endorsed for deposit with "Silverado Banking"; (3) a deposit of $ 1,000 was credited to the Silverado Savings and Loan Association (Silverado Savings) account of CWP No. 10 on July 25, 1983; and (4) in early August 1983 checks were signed by Mr. Conklin [11] as a signatory and drawn on the Silverado Savings account for various payees and expenses, [12] including rent and utilities bills, of Mr. Carr. This pattern of almost simultaneous check transfers and payments of personal expenses of Mr. Carr from the CWP No. 10 account continued from at least December 22, 1982, when he opened the account at Silverado Savings using petitioner's tax identification number and *100 designating Mr. Conklin as signatory, through August 24, 1984. From January 1983 through August 1984, 25 checks totaling $ 13,514.22, all signed by Mr. Conklin, were written on the CWP No. 10 Silverado Savings account payable to Mr. Carr. Quarterly and annual parish reports for CWP No. 10 state (1) amounts for (a) parish bank balances, (b) income, including offerings or donations, and (c) expenses, including "housing allowances", "reimbursements", and other expenses without explanation or substantiation; and (2) the number of religious services and parish activities, *101 which include bestowing sainthoods, "Born Again Virginity", and a martyrdom and performing a "Rent-a-Bishop" ceremony. [13]
On their Federal income tax return for 1983, Mr. Carr and his wife reported adjusted gross income of $ 69,889.27 and claimed charitable contribution deductions totaling $ 26,952.41, most of which was designated as "BAPTIST CHURCH CONTRIBUTION (RECEIPTED)". On his Federal income tax return for 1984, Mr. Carr reported adjusted gross income of $ 43,568.32 and claimed charitable contribution deductions totaling $ 16,830.97, most of which was designated as "BAPTIST CHURCH (RECEIPTED)". On April 21, 1983, Mr. and Mrs. Lang and Ann E. Phillips executed a congregation agreement for CWP No. 33. Mr. and Mrs. Lang and Ann E. Phillips opened an account for CWP No. 33 at the First Bank of Westland on June 29, 1983, using petitioner's tax identification number and designating each of them *102 as signatories. From July through December 31, 1983, the Langs deposited eight checks totaling $ 2,796 to petitioner's Western Federal Savings account. From June through December 31, 1983, eight checks payable to CWP No. 33 totaling $ 2,441 were drawn on petitioner's Western Federal Savings account; at least $ 2,200 was deposited into the CWP No. 33 account at the First Bank of Westland, and 55 checks totaling $ 2,493.47 were written from the CWP No. 33 account to pay various payees and expenses, including unidentified Mastercard, VISA, Sears, cable television, telephone, and paint store bills. The expenses paid included water and utilities bills for 1983 totaling at least $ 475.79 for the Langs. There was a similar pattern in 1984. On their Federal income tax returns for 1983 and 1984, Mr. and Mrs. Lang reported adjusted gross income of $ 42,785 and $ 41,023, respectively, and claimed charitable contribution deductions of $ 5,922 and $ 3,311, respectively. On May 3, 1983, James P. Clark, Jeffrey Gove, and David McMillen opened an account for CWP No. 41 at Intrawest Bank of Boulder (Intrawest Bank), using petitioner's tax identification number. From June through December 1983, *103 Mr. Clark deposited $ 9,500 into petitioner's account at Western Federal Savings; 22 checks totaling $ 9,450 were drawn therefrom in favor of CWP No. 41 and deposited into its account at Intrawest Bank, and at least 70 checks totaling at least $ 9,350.55 were signed with Mr. Clark's name on the CWP No. 41 account at Intrawest Bank to pay various payees and expenses, including at least $ 549.46 for Mr. Clark's American Express, Mastercard, and life insurance bills, and $ 1,595 payable to cash or Mr. Clark. There was a similar pattern in 1984. On his Federal income tax returns for 1983 and 1984, Mr. Clark reported adjusted gross income of $ 28,387.61 and $ 26,182, respectively, and claimed charitable contribution deductions to the "BAPTIST CHURCH" of $ 10,150 and $ 8,500, respectively. In Clark v. Commissioner, T.C. Summary 1990-264, this Court concluded that Mr. Clark had fraudulently underpaid his income taxes for the years 1983 through 1985, in part based on the pattern of donations to petitioner, followed by checks to an account in petitioner's name, from which funds were withdrawn by and payable to Mr. Clark or his creditors. We noted Mr. Conklin's involvement in advising *104 Mr. Clark during several conference calls regarding Mr. Clark's failure to abide by the orders or Rules of this Court in his case. From July through December 31, 1983, the Weingartens wrote or endorsed checks [14] totaling at least $ 5,633 to petitioner's Western Federal Savings account, from which 12 checks totaling $ 5,252 were signed with Mr. Carr's name with the notation "cwp-80" and endorsed to an account at the United Bank of Arvada, and at least 31 checks totaling $ 6,247.67 were signed with Mr. Mohr's name in payment of various payees and expenses, including $ 344.68 in utility bills of the Weingartens and $ 486.40 payable directly to the Weingartens or a relative. There was a similar pattern from January to April 1984. On their Federal income tax returns for 1983 and 1984, the Weingartens reported adjusted gross income of $ 39,042 and $ 46,313, respectively, and claimed charitable contribution deductions designated as to "BAPTIST CHURCH" of $ 12,765 and $ 9,586, respectively. *105 On December 16, 1977, Mr. Conklin opened an account for petitioner, using its tax identification number, at Central Bank of North Denver (Central Bank). For 1979, checks drawn on Mr. Conklin's personal account at Central Bank or payable to him, totaling at least $ 6,160, were deposited in petitioner's account at Central Bank, and 13 checks totaling $ 6,505.74, most of which were signed by Mr. Conklin, were written on petitioner's account at Central Bank payable to Mr. Conklin. For 1980, checks drawn on Mr. Conklin's personal account at Central Bank, and a check and money order payable to him, totaling $ 9,495, were deposited in petitioner's account at Central Bank, and 22 checks totaling $ 9,371.35 were written on petitioner's account at Central Bank in favor of Mr. Conklin; of which 16 checks totaling at least $ 6,815 were signed by Mr. Conklin or with his wife's name. The checks payable to Mr. Conklin from petitioner's account bear notations, such as "housing allowance", "car allowance", and "missionary work". A check dated September 22, 1980, in favor of "Nat. Commodity and Barter Assoc." [15] written on petitioner's account at Central Bank signed by Mr. Conklin bears the notation *106 "course and literature". For 1981, Mr. Conklin wrote 16 checks totaling $ 9,200 on an account of the Universal Life Church, Inc., at Central Bank designated as donations to petitioner, which were deposited to petitioner's account in Central Bank, from which at least 23 checks totaling at least $ 5,195.36 were payable to Mr. Conklin, two of which were signed by Mr. Conklin. The checks payable to Mr. Conklin bear notations such as "Partial housing allowance", "approved auto reimb.", "House Allowance/Mortgage", "House Allowance/Pub Service", and "Housing Allow/Phone ". On their Federal tax returns for 1979, 1980, and 1981, Mr. Conklin and his wife reported adjusted gross income of $ 39,926, $ 42,212, and $ 29,940, respectively, and claimed charitable contribution deductions totaling $ 9,249, $ 10,832, and $ 10,025, respectively. *107 In a letter dated November 19, 1990, the Internal Revenue Service made a final determination revoking petitioner's tax-exempt status under section 501(c)(3) effective November 10, 1977, because petitioner had not "operated exclusively for exempt purposes within the meaning of section 501(c)(3)" and its "operations benefit private individuals." OPINION Respondent contends that petitioner was not operated exclusively for religious purposes because it furnished extensive tax advice and assisted individuals in money-laundering transactions with the objective of enabling them to obtain charitable deductions for funds used to pay personal expenses. In its opening brief, petitioner argues that (1) we should not consider financial activities of the parishes because they are not part of petitioner, (2) even if the parishes are considered as part of petitioner, petitioner required them to file quarterly reports to prevent misuse of funds, and (3) Mr. Conklin was the only person who withdrew money from petitioner's account and those withdrawals represented reasonable compensation in the form of an exempt section 107 housing allowance, for his extensive activities (e.g., weddings) in furtherance *108 of petitioner's religious purposes. In its reply brief, petitioner maintains that (1) collateral estoppel or res judicata applies to prevent the Internal Revenue Service from revoking petitioner's section 501(c)(3) status because its newsletters were considered before it was granted an exemption, and the Internal Revenue Service knew that Mr. Conklin was on its board of directors and a signatory on its bank account, (2) it is entitled to provide the public with tax information, (3) the Internal Revenue Service only introduced selected pages of its newsletters in evidence, and (4) the material respondent has introduced in this case was obtained in violation of the requirements of section 7605(c). We agree with respondent that petitioner has not shown that it was operated exclusively for religious purposes. Section 7428 grants this Court nonexclusive jurisdiction to issue a declaratory judgment regarding the initial or continuing qualification of an organization under section 501(c)(3). The burden of proof is on petitioner to overcome the grounds set forth in respondent's notice of revocation. [16]Rule 217(c)(2); Virginia Education Fund v. Commissioner, 85 T.C. 743, 750 (1985), *109 affd. 799 F.2d 903 (4th Cir. 1986); Hancock Academy of Savannah, Inc. v. Commissioner, 69 T.C. 488, 492 (1977). Section 501(a) provides in part for tax exemption for an organization described in section 501(c). Section 501(c)(3) refers in part to a corporation organized and operated exclusively for religious purposes, if no part of its net earnings inures to the benefit of any private shareholder or individual. The requirement that a section 501(c)(3) organization operate exclusively for exempt purposes does not mean solely or absolutely without exception, but that any nonreligious, nonexempt purpose, furthered by the organization's activities must be insubstantial *110 compared to the religious purpose served. Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279 (1945); Kentucky Bar Foundation v. Commissioner, 78 T.C. 921, 923 (1982); Church In Boston v. Commissioner, 71 T.C. 102, 107 (1978). Furthermore, a single activity may further a nonexempt as well as an exempt purpose. B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 356-358 (1978). The record here reflects a pattern of petitioner granting parishes charters, allowing the use of its name, status, and tax identification number, and designating individuals as ministers, in return for "requested donations", without other qualification. The parishes and Mr. Conklin have used petitioner's status in the circular flow of funds through various bank accounts established in petitioner's name, with its tax identification number, to facilitate individuals' claiming charitable contribution deductions for amounts which were returned to them and used to pay personal expenses, which were characterized as tax-free section 107 housing allowances or reimbursement *111 of church expenses. Petitioner has not shown that its promotion of "mail-order" church and minister status, see Church of Ethereal Joy v. Commissioner, 83 T.C. 20, 26-27 (1984), and facilitating this circular flow of funds, cf. Dew v. Commissioner, 91 T.C. 615, 624-625 (1988), did not serve a substantial nonexempt purpose. Indeed, petitioner has not placed evidence in the record to contradict or adequately explain the patterns. In Church of Ethereal Joy v. Commissioner, supra at 27, we noted that Mr. Conklin "is an active participant in a widespread abuse of the revenue laws through the promotion of mail-order 'churches'" based on findings of fact showing his connection to the Universal Life Church in Denver and various other "churches", including petitioner. Petitioner's newsletters, advertisements, and other documents highlight and emphasize tax advice and information to the same extent as those of the organization in Universal Life Church, Inc. v. United States, 13 Cl. Ct. 567 (1987), affd. without opinion 862 F.2d 321 (Fed. Cir. 1988). *112 See also Ecclesiastical Order of ISM of AM, Inc. v. Commissioner, 80 T.C. 833, 840-841 (1983), affd. without published opinion 740 F.2d 967 (6th Cir. 1984). The tax advice and information are intertwined with the circular movement of funds, charitable contribution deductions, and alleged section 107 housing allowances. Petitioner offered detailed advice concerning the deductions and housing allowance in return for a "requested donation". The extent of and emphasis upon tax advice and information, especially in facilitating the scheme involving the circular flow of funds described above, further indicate that petitioner is not operated exclusively for religious purposes. Petitioner urges us to disregard financial information relating to the parishes because allegedly they are not part of petitioner. However, petitioner sold church charters, advised the parishes to use petitioner's name and tax identification number, and allowed their funds to flow into and out of its Western Federal Savings account. Having created these arrangements under which funds were transferred to petitioner and then returned to the parishes, petitioner *113 assumed responsibility for, and cannot now disavow, the use of the funds by the parishes. Petitioner offers no explanation of the need for these arrangements. Petitioner next contends that it sought to prevent any misuse of funds by requiring the parishes to file quarterly reports. However, the quarterly reports that are in evidence are manifestly inadequate to allow anyone to determine whether there was any misuse, and there is no evidence other than self-serving minutes that petitioner enforced the requirement that reports be filed or adequately monitored the reports which it received. For example, there is no evidence that petitioner ever disallowed, or even questioned, a requested payment. Petitioner points to evidence in the record suggesting that Mr. Conklin performed numerous weddings. Although this activity may have furthered petitioner's religious purposes, obviously it does not negate our conclusion that petitioner engaged in activities furthering substantial nonexempt purposes. We reject petitioner's contention that the Internal Revenue Service is prevented from revoking petitioner's status under section 501(c)(3) by collateral estoppel or res judicata. We do not *114 agree that petitioner's application for recognition of exemption adequately disclosed the method of operations reflected in the record. However, even if it had, collateral estoppel or res judicata applies only to issues determined by a court of competent jurisdiction, Montana v. United States, 440 U.S. 147, 153 (1979), not where the only determination was at the administrative level. Additionally, petitioner did not specifically plead these affirmative defenses in its petition [17] as required under Rule 39. Petitioner's suggestion that it merely provided the public with tax information is disingenuous. Petitioner did not provide only tax information; in exchange for "requested donations", *115 it allowed, and indeed advised, its ministers and parishes to use its name and tax identification number on their bank accounts and to flow their funds through its Western Federal Savings account. Although petitioner complains that the Internal Revenue Service introduced only selective passages of petitioner's newsletters, petitioner failed to introduce any complete copies in evidence. Thus, we reject the suggestion that the record is misleading as to the content of the newsletters. Finally, petitioner contends that no material from "any and all summonses" should be considered as evidence because the summonses sought information beyond the "extent necessary" language under section 7605(c). In Church of World Peace, Inc. v. Commissioner, T.C. Memo. 1992-318, we declined to exclude evidence obtained through the summons in issue, [18] on the grounds that the Internal Revenue Service acted in good faith based on an arguably valid summons which the District Court for the District of Colorado had enforced. We made that ruling after the Court of Appeals for the Tenth Circuit reversed the District Court on First Amendment grounds because of its concern with *116 the portion of the April 4, 1984, summons requesting petitioner's membership list and the names of persons for whom marriage ceremonies were performed, United States v. Church of World Peace, 775 F.2d 265 (10th Cir. 1985). We note that in United States v. Church of World Peace, 878 F.2d 1281, 1284-1285 (10th Cir. 1989), the Court of Appeals for the Tenth Circuit recognized that the Internal Revenue Service in effect had narrowed the summons as originally issued and concluded that petitioner could move to suppress the information obtained from the summons if and to the extent that the Government sought to use it in subsequent proceedings. The April 4, 1984, summons requested the names of those members of petitioner who carried out sacerdotal functions, which, according to testimony in this case, referred to persons with authority to administer petitioner's functions and perform weddings and ordinations, not all members. Respondent introduced testimony indicating that in 1988 petitioner and Mr. Conklin voluntarily furnished the names of persons married by petitioner and of persons seeking ordination as ministers. Mr. *117 Conklin stated on the record that he provided these names because he thought the Internal Revenue Service already had them, and they would support petitioner's position. On brief, petitioner relied on the information in the record regarding the weddings Mr. Conklin performed. Respondent introduced acceptable, reliable, and competent testimony and evidence indicating that respondent was aware in 1980 that petitioner and Mr. Conklin were selling mail-order ministries. Additionally, respondent introduced testimony that information regarding the bank accounts of petitioner and the parishes would have been discovered independently through the Internal Revenue Service examinations of individual taxpayers, such as Mr. Clark (see supra note 9). *118 We reject petitioner's contention and reaffirm our conclusions in Church of World Peace, Inc. v. Commissioner, T.C. Memo. 1992-318. Assuming arguendo section 7605(c) applies when the determination of an organization's status as a church is in issue, the April 4, 1984, summons was effectively narrowed by the Internal Revenue Service, as recognized by the Court of Appeals for the Tenth Circuit in United States v. Church of World Peace, 878 F.2d at 1284-1285. Moreover, petitioner appears to have voluntarily provided in 1988 some of the information which concerned the Court of Appeals for the Tenth Circuit. Additionally, except possibly for the names of the persons married by petitioner, which Mr. Conklin provided voluntarily in any event, the information obtained from the April 4, 1984, summons as narrowed, which was admitted in evidence here, appears to us to meet the "extent necessary" language of section 7605(c), [19] *120 based on the 1980 advertisement indicating to the Internal Revenue Service that petitioner and Mr. Conklin were selling ministries. [20] We are also convinced and there is persuasive testimony here that *119 information relating to the bank accounts of petitioner and the parishes would have been independently discovered through the Internal Revenue Service examinations of individual taxpayers such as Mr. Clark. See Nix v. Williams, 467 U.S. 431 (1984); United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982); see also United States v. Allen, 986 F.2d 1354 (10th Cir. 1993); Floyd v. United States, 860 F.2d 999, 1005-1006 (10th Cir. 1988). Furthermore, even if we considered the April 4, 1984, summons to be invalid and disregarded the information resulting from it, we would still conclude that petitioner has failed to establish that it operated exclusively for religious purposes. To reflect the foregoing, An appropriate decision will be entered. Footnotes
1. All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. In Colorado Reform Baptist Church, Inc. v. Commissioner↩, docket No. 29125-90X, which involves a similar declaratory judgment action, the parties filed a stipulation to be bound by the final decision in this case.
3. Forms 1040, U.S. Individual Income Tax Returns for 1979 through 1981, indicate that William Conklin's wife was Mary Ann Tavery. Mary Ann Tavery was a member of petitioner's board of directors during at least 1977, 1978, 1981, 1983, and 1984.↩
4. Various other similar advertisements and articles dated from Aug. 1981 through Sept. 1983 relating to Mr. Conklin were contemporaneously placed in the Internal Revenue Service administrative file.↩
5. On Nov. 30, 1992, petitioner filed Petitioner's Renewed Motion to Suppress All Information that the IRS Obtained from Illegal Summons Based on a Supreme Court Case Decided Nov. 16, 1992. By Order dated Dec. 16, 1992, we denied petitioner's motion.↩
6. The terms "minister", "parish", or "pastor" are used herein for convenience only and not to indicate the sec. 501(c)(3)↩ status of the entities involved.
7. The terms "congregation" and "parish" are used interchangeably in the record.↩
8. Records of the "parish of the Beatitudes", in which Alexander J. Von Furstenberg was president and bishop, were also presented at trial. Petitioner's board of directors' minutes for Mar. 30, 1983, state that: "All congregations will be required to operate out of Church of World Peace, Inc. accounts. Congregations will adopt a nickname to use in the phone book because numbers in the phone book do not make sense." The record reflects that some of the above parishes had both number and nickname designations but indicates only a name or a number for others.↩
9. Mr. Clark's tax return for 1984 was independently selected for examination by the Internal Revenue Service in about January 1986. As part of the examination, the Internal Revenue Service issued a summons to the Security Bank of Boulder for records relating to Mr. Clark's bank account for the period Dec. 1, 1982, through Dec. 31, 1985. The records reflected deposits to petitioner's account at Western Federal Savings and Loan Association of Colorado (Western Federal Savings) and a Colorado Reformed Baptist Church bank account at the United Bank of Denver. The Tax Protestor Coordinator for the Internal Revenue Service Denver District from June 1983 to May 1985 testified that the exempt organization office already knew about petitioner's account at Western Federal Savings, and, if they had not known, he would have advised that office about it based on the information obtained from Mr. Clark's examination. Also, he testified that examinations of other individuals whose returns had been selected based on the criteria for examining returns in which charitable contribution deductions exceeded 30 or 35 percent of adjusted gross income and were designated with "buzz words" such as "church-receipted", "Universal Life Church", "ULC", "Church of World Peace", "CWP", "Reformed Baptist Church", or "Baptist Church" had revealed deposits to petitioner's account at Western Federal Savings.↩
10. Mr. Conklin and Mr. Carr, designated as Archbishop and pastor, respectively, had signatory authority over petitioner's Western Federal Savings account.↩
11. The handwriting on these checks and others appears to match that of Mr. Conklin elsewhere in the record, and he does not contend that the checks were not signed by him.↩
12. At other times, checks were drawn on the Silverado Savings account to pay Mr. Carr's VISA and Mastercard bills.↩
13. The Rent-a-Bishop concept is described elsewhere in the record as the spiritual alternative to the singing telegram.↩
14. Some of these checks were written on a personal account of the Weingartens with United Bank of Broomfield.↩
15. The National Commodity and Barter Association is an unincorporated association which "espouses dissident views on the federal tax system and advocates a return to currency backed by gold and/or silver". See Grandbouche v. Commissioner, 99 T.C. 604, 606↩ (1992).
16. Petitioner pleaded in its petition that the burden of proof should be shifted to respondent because the notice of revocation was allegedly arbitrary and capricious. Petitioner did not argue this on brief, and it is not supported in the record. Thus, we consider the argument to have been abandoned.↩
17. In its petition, petitioner pleaded the doctrine of laches and that the Internal Revenue Service did not complete its examination of petitioner in 2 years allegedly in violation of the requirements of sec. 7611. Neither argument was made on brief, and we consider both to have been abandoned.↩
18. The summons in issue is the Apr. 4, 1984, summons to petitioner. Although petitioner moved to quash third-party summonses in Church of World Peace, Inc. v. United States, 58 AFTR 2d 86↩-5069, 86-1U.S.T.C. par. 9375 (D. Colo. 1986), the District Court denied its motion, concluding that the third-party summonses were not far reaching but issued to banks to request information relating to financial transactions of petitioner. The District Court rejected petitioner's assertion that the third-party summonses should have been quashed because the information resulting in these summonses was obtained from records furnished pursuant to the prior Apr. 4, 1984, summons. Petitioner did not appeal this District Court decision.
19. As applicable to the Apr. 4, 1984, summons, sec. 7605(c) provided in relevant part as follows: SEC. 7605. TIME AND PLACE OF EXAMINATION. * * * (c) Restriction on Examination of Churches. * * * No examination of the religious activities of such an organization shall be made except to the extent necessary to determine whether such organization is a church or a convention or association of churches, and no examination of the books of account of such an organization shall be made other than to the extent necessary to determine the amount of tax imposed by this title.
Sec. 7605(c)↩ was amended and replaced by sec. 7611 with respect to such inquiries and examinations beginning after Dec. 31, 1984, by sec. 1033 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 1034-1039.
20. Mr. Conklin suggested that the Internal Revenue Service did not have the 1980 advertisement or other advertisements and articles relating to Mr. Conklin at the time that the Apr. 4, 1984, summons was challenged or they would have been presented to the District Court in the summons enforcement proceedings. We found credible the testimony that the Internal Revenue Service had the advertisements and articles before the Apr. 4, 1984, summons was issued. We note that some of these advertisements and articles were detailed in Church of Ethereal Joy v. Commissioner, 83 T.C. 20, 24-26↩ (1984), which would tend to support this testimony.